[No. B180779. Second Dist., Div. Four. Sept. 22, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
TYLER CORCORAN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts A. and C. of the Discussion.

COUNSEL

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Marc E. Turchin, and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WILLHITE, Acting P. J.**—Defendant and appellant Tyler Corcoran appeals from a judgment imposing a determinate term of 32 years in state prison plus two consecutive indeterminate life terms, each with a 10-year enhancement for personal use of a gun, after a jury found him guilty of robbery, attempted robbery, simple and aggravated kidnapping, dissuading a witness, and false imprisonment. He contends on appeal that (1) the trial court erred by denying his motion to suppress; (2) there was insufficient evidence to establish kidnapping; and (3) there was insufficient evidence to establish a violation of Penal Code section 136.1, subdivision (c)(1) (dissuading a witness).[1] In the published portion of this opinion, we hold that there was substantial evidence showing both that the movement of the kidnapping victims was not merely incidental to the attempted robbery and that the movement substantially increased the risk of harm to the victims. Therefore, there was sufficient evidence to sustain the kidnapping convictions. In the unpublished portion of the opinion, we find no merit to his other contentions. Accordingly, the judgment is affirmed.

### BACKGROUND

On the morning of January 11, 2003, five people were working at United Desert Charities in Lancaster, preparing for Saturday night bingo: Nora

---

[1] Further undesignated statutory references are to the Penal Code.

Kirkbride, Patrick Lawrence, Andrew Arciniega, Adriana Mendez, and Carrie Gundersen. Lawrence, the maintenance supervisor, was cleaning the bingo hall, near the entrance. According to Lawrence, the bingo hall is a large building, with approximately 24,000 square feet of interior space. Mendez and Gundersen, who were performing community service, were assisting in the cleanup. Arciniega, a custodian, was cleaning the restroom toward the back of the bingo hall. Kirkbride, the secretary/treasurer of United Desert Charities, was in her office, which opened into the bingo hall, counting and sorting the cash (approximately $10,000) that would be used for the bingo games.

Around 10:00 a.m., two young men—one White and the other Black—entered the building. The White man pulled a gun and pointed it at Lawrence. When Lawrence tried to knock the gun away, the Black man grabbed Lawrence around the neck, pointed a gun at his neck, and said, "Don't be foolish old man."

Kirkbride heard loud voices and scuffling, looked out of her office door, and saw Lawrence "being manhandled" outside her office. She grabbed her gun and came out of her office. The Black man ordered her to drop her gun, and she did. The Black man picked up her gun.

Mendez was standing about 40 feet away from Lawrence and saw the Black man holding Lawrence around the neck. The White man, who was standing near Lawrence and the Black man, saw Mendez, pointed the gun at her, and told her to come over to where they were standing. Mendez just stood there, and the White man started walking toward her. In the meantime, Arciniega, who was cleaning the restroom, heard loud noises and stepped out of the restroom to see what was going on. He could see a few people toward the front of the bingo hall, but he could not see what was happening because he was not wearing his glasses. He went back into the restroom. The Black man saw Arciniega, and told the White man to go get him.

As the White man ran toward the bathroom, Mendez ran through a nearby exit door. She ran toward a neighboring business, a Terry Lumber yard, yelling for help. An employee of Terry Lumber lent her his cell phone, and she called 911.

The White man went into the restroom, pointed a gun at Arciniega, and told him to get out of the restroom. The White man also pointed a gun at Gundersen, who was standing near the restroom, and told her to go over to a counter where Lawrence and Kirkbride were standing or sitting. Arciniega and Gundersen walked over to the counter, followed by the White man.

The Black man, who had run to the exit door after Mendez, came back toward the counter. He got on a walkie-talkie and told somebody to come and get them. He and the White man then ordered Lawrence, Kirkbride, Arciniega, and Gundersen into an office at the back of the bingo hall. Lawrence estimated the distance to the back office to be about 10 feet. When Gundersen went behind the desk in the office, the White man said, "I know what you're doing, bitch" and pulled out from the wall what appeared to be a telephone cord (in fact, the cord he pulled out was for a computer). The White man told them not to come out of the office or they would be shot. One of the robbers or Lawrence closed the door to the office and Lawrence locked it from the inside. Gundersen called 911 on her cell phone. When she finished talking to the 911 operator, Lawrence opened the office door and saw that the robbers were gone. By that time, the police had arrived.

At 10:21 a.m., Deputy Miguel Torres was on patrol and received a report of a robbery at United Desert Charities. The report described the suspects as follows: "Male White adult and male Black adult entered location with a gun, wearing black and beanies; both have guns, black jackets and jeans." Torres immediately thought that defendant, who was 17 years old, might be involved. Torres had made a traffic stop a few months earlier in connection with a home invasion robbery perpetrated by a White male and a Black male. During that stop, defendant, who is White, was in the company of several Black men. Torres believed that defendant was involved in the home invasion robbery, although defendant was never arrested for that incident. In fact, Torres drove defendant home after the stop.

When he received the report of the robbery at United Desert Charities, Torres drove to defendant's home, which was two to four miles away from the robbery location. Approximately seven to 10 minutes after he received the report, as he was pulling his patrol car out of defendant's driveway, he saw defendant and a Black man walking down the street in his direction. Neither man was wearing a beanie, but defendant was wearing a black jacket and the Black man was wearing a dark brown jacket. Torres exited his patrol car with his gun drawn and ordered the two men to stop. They continued walking past him, and the Black man tossed something under a nearby tree. Torres again ordered them to stop and come to him. They stopped and turned around. The Black man then ran off, while defendant remained.

Torres removed defendant's jacket and put it in the trunk of his patrol car, then did a quick patdown search of defendant and put him in the backseat of the car so he could retrieve the item that the Black man had tossed. That item was a dark blue and yellow two-way radio. Torres recovered it and threw it

on the dashboard of his patrol car. Upon seeing it, defendant said, "Hey, that's my radio." Torres told defendant, "No. Your buddy tossed it." Defendant responded, "Oh. Okay. That's right." When Torres reported that he had recovered a two-way radio, he was alerted that the robbery suspects had used a two-way radio during the robbery.

Mendez and Arciniega were brought together (in the same patrol car) to the location where Torres was detaining defendant, and both identified defendant as one of the robbers. Gundersen also identified defendant as one of the robbers in a separate field showup.[2] Both field showups took place about a half an hour after the robbery. Torres then transported defendant to the Sheriff's station. When he removed defendant's jacket from the trunk of the patrol car and searched it, he found a two-way radio in the pocket that matched the radio he had recovered earlier.

Defendant was charged by information with one count of second degree robbery (§ 211), four counts of attempted second degree robbery (§§ 211, 664), five counts of false imprisonment by violence (§ 236), four counts of dissuading a witness by force or threat (§ 136.1, subd. (c)(1)), and four counts of kidnapping to commit another crime (§ 209, subd. (b)(1)). The information also alleged that defendant personally used a gun under the meaning of section 12022.53, subdivision (b) (as to the robbery, attempted robbery, and aggravated kidnapping counts), and section 12022.5, subdivision (a)(1) (as to the false imprisonment and dissuading a witness counts). A jury found defendant guilty on the following counts: robbery of Kirkbride; attempted robbery of Lawrence; false imprisonment of Kirkbride, Lawrence, Arciniega, Mendez, and Gundersen; dissuading a witness, i.e., Kirkbride, Lawrence, Arciniega, and Gundersen; aggravated kidnapping of Kirkbride and Lawrence; and the lesser included offense of simple kidnapping (§ 207, subd. (a)) of Arciniega and Gundersen. The jury acquitted defendant of attempted robbery and aggravated kidnapping of Arciniega and Gundersen.

Defendant moved for a new trial based upon juror misconduct. The trial court held a two-day hearing at which each of the jurors (except one, who had moved out of state) testified. The court denied the motion and imposed sentence computed as follows: The court chose the simple kidnapping of Gundersen as the base count, and imposed the midterm of five years plus 10 years for the gun use enhancement (§ 12022.53, subd. (b)). The court

---

[2] In addition to the field showups, Arciniega, Mendez, Lawrence, and Kirkbride were shown photo lineups later that same day. Arciniega and Lawrence identified defendant as one of the robbers, but neither Mendez nor Kirkbride could identify anyone. Gundersen identified defendant from a photo lineup six months later.

imposed a consecutive term of five years for the simple kidnapping of Arciniega, plus an additional 10 years for the gun use enhancement, and a consecutive term of two years for the false imprisonment of Mendez (one-third the midterm of two years for the offense plus one-third the midterm of four years for the § 12022.5, subd. (a) gun use enhancement). In addition, the court imposed concurrent sentences of seven years on each of the four dissuading a witness counts (the midterm of three years on the offense plus the midterm of four years on the § 12022.5, subd. (a) gun use enhancement). Finally, the court imposed consecutive life sentences for each of the two aggravated kidnapping convictions, plus 10-year terms for the section 12022.53, subdivision (b) gun use enhancements for each count. The court dismissed the robbery, attempted robbery, and false imprisonment counts as being lesser included offenses. Defendant appeals from the judgment.

## DISCUSSION

### A. Motion to Suppress*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. Kidnapping Counts

Defendant challenges his conviction on all four of the kidnapping counts (aggravated kidnapping of Kirkbride and Lawrence and simple kidnapping of Arciniega and Gundersen). He contends there was insufficient evidence to support a finding that the movement of the four victims was not incidental to the commission of the attempted robbery, or that the movement increased the risk of harm to the victims. We disagree.

■ "Kidnapping for robbery, or aggravated kidnapping, requires movement of the victim that is not merely incidental to the commission of the robbery, and which substantially increases the risk of harm over and above that necessarily present in the crime of robbery itself." (*People v. Rayford* (1994) 9 Cal.4th 1, 12 [36 Cal.Rptr.2d 317, 884 P.2d 1369].) The Supreme Court has explained that the determination whether the movement in any particular case meets this standard involves a consideration of "the 'scope and nature' of the movement," and "the context of the environment in which the movement occurred." (*People v. Rayford, supra,* 9 Cal.4th at p. 12.)

■ Recently, the court reexamined the question when evidence of a forced movement of a victim is sufficient to satisfy this standard, and noted

*See footnote, *ante,* page 272.

that the standard "suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 [47 Cal.Rptr.3d 575].) The court also noted that "whether the victim's forced movement was merely incidental to the [underlying crime] is necessarily connected to whether it substantially increased the risk to the victim." (*Ibid.*) Some of the circumstances that should be considered when determining whether the movement increased the risk to the victim include "whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes."[4] (39 Cal.4th at p. 1152.) The court instructed that measured distance is relevant, but "no minimum distance is required to satisfy the asportation requirement" of aggravated kidnapping "so long as the movement is substantial" (*ibid.*), and "each case must be considered in the context of the totality of its circumstances." (*Ibid.*) Thus, "[i]n some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient." (*Ibid.*)

 In the present case, a "multifaceted, qualitative evaluation" of the evidence shows that substantial evidence proved the asportation element. Defendant and his accomplice aborted their attempted robbery of cash from the bingo hall after Mendez escaped and fled to a neighboring business. At gunpoint, they herded the victims approximately 10 feet from a public area to a small back office without windows and with a solid door.[5] Believing that Gunderson was trying to call the police, defendant pulled what he believed to be a telephone cord out of the wall. He threatened to shoot the victims if they left the office.

Unlike the circumstances in *People v. Washington* (2005) 127 Cal.App.4th 290 [25 Cal.Rptr.3d 459] (*Washington*), in which the appellate court held that movement of bank employees to a vault room out of public view did not satisfy the asportation standard because that movement was necessary to obtain the money and complete the robbery, in the present case the victims were not taken to the location of the money the robbers sought to obtain. In *Washington*, "there was no excess or gratuitous movement of the victims over and above that necessary to obtain the money in the vault." (*Washington, supra,* 127 Cal.App.4th at p. 299.) In the instant case, the movement of the

---

[4] These same circumstances are to be considered in determining whether there was sufficient movement to support a conviction of simple kidnapping in violation of section 207, subdivision (a). (*People v. Martinez* (1999) 20 Cal.4th 225, 237 [83 Cal.Rptr.2d 533, 973 P.2d 512].)

[5] At oral argument, defendant conceded that the distance the victims were moved was "substantial" within the meaning of relevant case law.

victims had nothing to do with facilitating taking cash from the bingo hall; defendant and his accomplice had aborted that aim, and their seclusion of the victims in the back office under threat of death was clearly "excess and gratuitous."

We also find the instant case distinguishable from *People v. Hoard* (2002) 103 Cal.App.4th 599 [126 Cal.Rptr.2d 855] (*Hoard*). There, the defendant committed robbery by forcing two jewelry store employees to move about 50 feet to the office at the back of the store. The court reasoned: "Confining the women in the back office gave defendant free access to the jewelry and allowed him to conceal the robbery from any entering customers who might have thwarted him. Defendant's movement of the two women served only to facilitate the crime with no other apparent purpose." (*Hoard, supra,* 103 Cal.App.4th at p. 607.) In the instant case, as we have noted, the movement of the victims did not serve to facilitate the forcible attempted taking of money from the bingo hall. Rather, it served other purposes squarely recognized by the Supreme Court in *People v. Dominguez, supra,* 39 Cal.4th 1141 as supporting a finding of a substantial increase in danger: removing the victims from public view, decreasing the odds that the attempted robbery of cash from the bingo hall would be detected, increasing the risk of harm should any victim attempt to flee, and facilitating the robbers' escape. Indeed, there was no purpose for moving the victims to the back office *except to* facilitate these aims. In context, this movement was not merely brief and trivial; to the contrary, it substantially increased the risk of harm beyond that inherent in the crime of attempted robbery.

Considering the totality of the circumstances, and understanding that measured distance is not alone determinative (*People v. Dominguez, supra,* 39 Cal.4th at p. 1152), and further viewing the evidence in the light most favorable to the People (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738]), we hold there was substantial evidence to support the kidnapping convictions.

C. *Dissuading a Witness Counts**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 272.

## DISPOSITION

The judgment is affirmed.

Manella, J., and Suzukawa, J., concurred.

A petition for a rehearing was denied October 13, 2006, and appellant's petition for review by the Supreme Court was denied December 20, 2006, S147497.