[No. B185745. Second Dist., Div. Three. Mar. 8, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY WAYNE JAMES, Defendant and Appellant.

## Counsel

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jamie L. Fuster and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CROSKEY, J.**—Defendant and appellant Gregory Wayne James, along with several associates, robbed the Bingo Club of more than $60,000 one Sunday morning before the Bingo Club had opened for business that day. Defendant and his associates gained entry to the Bingo Club by pointing a gun at the head of a maintenance worker who was outside, hosing down the parking lot. At gunpoint, the worker was forced to knock on the door and identify himself. When fellow employees opened the door for him, the robbers entered. The robbers forced all employees, including the maintenance worker, to lie on the floor, while they led the Bingo Club's managers to the safes, where they obtained the money. Defendant was convicted of kidnapping for robbery with respect to the maintenance worker, and several counts of robbery. Defendant appeals his conviction, challenging only the count of kidnapping for robbery. Defendant contends the forced movement of the maintenance worker, at gunpoint, from outside the Bingo Club to its interior, is insufficient to establish the asportation element of aggravated kidnapping. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On Sunday, December 15, 2002, defendant and several associates robbed the Bingo Club in Hawaiian Gardens. The Bingo Club's money is stored in four different safes in the "cage" area. The Bingo Club always keeps $60,000 on hand in two of the safes. In a third safe, the Bingo Club stores its daily deposits before sending them to the bank in an armored car. The armored car did not pick up deposits on weekends, so the deposits from Friday and Saturday night would be found in this safe on Sunday mornings.

The Bingo Club opened its doors for business at noon on Sundays. At 10:00 a.m., on December 15, 2002, the only people in the Bingo Club were office manager Michelle Hines, her six-year-old son, and several maintenance workers cleaning the inside and outside of the establishment. One such employee was Jesus Gonzalez, who was outside cleaning the parking lot.[1] Gonzalez knocked on the door to the Bingo Club and said, "It's me." One of the other workers, Ignacio Barrera, recognized Gonzalez's voice and opened the door to let him in. When Barrera opened the door, he saw another man standing behind Gonzalez, pointing at gun at Gonzalez's back. The armed

---

[1] Gonzalez did not testify at defendant's trial.

man ordered Barrera to turn around and lie on the floor. The armed man and one of his associates entered the Bingo Club. The robbers threw Gonzalez to the floor with Barrera. Two other employees, Manuel Martinez and Mateo Gomez, were also either thrown down or ordered to lie down with them. At some point later in the robbery, one of the robbers opened the door to let in two more robbers.

Hines was inside the cage area of the Bingo Club, with her son outside. Defendant pushed Hines into the cage, grabbed her by the neck, put his gun to the back of her head, and asked her to open the safes. Hines only knew the combination for the safe containing the deposits. She opened the safe, revealing four deposit bags. After taking those bags, defendant asked Hines to open the other safes. Hines explained that she could not do so as she did not know the combination. Defendant called her a liar.

Defendant then asked how to turn off the security cameras inside the Bingo Club. Hines said that the main system was in the office, so defendant brought her to the office. Hines attempted to press buttons on the system to eject the videotape; she was unaware that the security cameras were digital and there was no tape. Hines eventually told defendant to just take the whole thing. Defendant then pulled Hines onto the ground, had her lie on her stomach, and sat on top of her. He cut open one of the deposit bags and yelled at Hines that he knew there was more money. Hines again explained that she did not know how to open the other safes. She offered to call her supervisor, Al Lazar, who knew the combination. Defendant agreed, but told Hines to make sure she did not let Lazar know the robbers were present. Hines telephoned Lazar on his cellular phone. Lazar was already on his way to the Bingo Club, and said he would arrive in five minutes. Hines relayed this information to defendant. Defendant then brought Hines back out into the bingo hall.

While defendant was with Hines in the cage and office, one or more of the other robbers remained with the workers who were on the floor of the Bingo Club. The workers were ordered to close their eyes. The robbers reached into the workers' pockets, removed money from their wallets, and replaced the wallets.[2] After lying on the floor for some time, the workers were moved and told to lie on the floor in another location, which is where Hines and her son had been brought.

---

[2] While it is likely that the robbers took money from Gonzalez at this time, there was no evidence that anything was taken from him, as he did not testify. As a result, the trial court granted defendant's motion for judgment of acquittal on the count alleging robbery of Gonzalez.

Defendant then walked Hines to another section of the Bingo Club, where she and her son were permitted to sit. Some time later, Lazar arrived. Lazar opened the door to the Bingo Club and discovered an armed man, who said, "Let's go to the safes." Lazar complied. At the safes, Lazar and the armed men were met by another robber. Lazar was unable to open the safes because he could not enter the combination without his glasses. He therefore gave the combination to the armed robber and instructed him on how to open the safes, which contained $60,000. The robbers put the money in garbage bags and then brought Lazar out into the bingo hall.

At gunpoint, the robbers then marched Lazar, Hines, Hines's son, Gonzalez, Barrera, Martinez and Gomez into a single-person bathroom. The robbers told the victims not to leave the bathroom for 10 minutes. About seven minutes later, the victims left the bathroom. The victims' estimates for the length of the entire robbery varied, with Barrera testifying the workers had lain on the floor for more than an hour, while Gomez estimated only eight to 14 minutes.

The December 15, 2002 robbery was not the first robbery at the Bingo Club. On August 4, 2002, a similar robbery was committed by four robbers. As with the December 15, 2002 robbery, the August robbery took place on a Sunday at 10:00 a.m. In both robberies, the Bingo Club's maintenance workers had been ordered to lie on the floor, while one armed man ordered Lazar to open the safes. In the August 4, 2002 robbery, one of the robbers grabbed a female employee by her hair, and struck her with a gun. A male employee was also hit.

On July 7, 2003, defendant was charged by information with nine counts of robbery (Pen. Code, § 211), two counts of kidnapping for robbery (Pen. Code, § 209, subd. (b)(1)), and three counts of assault (Pen. Code, § 245, subd. (a)(2)) arising out of both robberies. Defendant entered a plea of not guilty and proceeded to jury trial. At the close of the prosecution's case, the trial court granted defendant's motion for judgment of acquittal on four counts. The jury was unable to reach a verdict on the counts pertaining to the August 4, 2002 robbery, and the trial court granted a mistrial.[3] As to the December 12, 2002 robbery, the jury found defendant guilty of kidnapping for robbery of Gonzalez, and five additional counts of robbery (victims Barrera, Gomez, Martinez, Hines and Lazar). Firearm enhancements under Penal Code section 12022.53, subdivision (b) were found to be true.

---

[3] The counts were subsequently dismissed as the prosecution was unable to proceed.

Defendant's motion for a new trial, on the basis of insufficient evidence of kidnapping for robbery, was denied. Defendant was sentenced to life in prison for the kidnapping for robbery, with a 10-year enhancement for the firearm use. He received concurrent terms of 15 years for each of the robberies. Defendant filed a timely notice of appeal.

## CONTENTIONS OF THE PARTIES

On appeal, defendant challenges only his conviction of kidnapping for robbery. Specifically, defendant contends the evidence is insufficient to establish the asportation element of the offense, as his movement of Gonzalez from the outside to the inside of the Bingo Club was merely incidental to his robbery of the Bingo Club, and the movement did not increase the risk of harm to Gonzalez. We disagree and affirm.

## DISCUSSION

### 1. *Standard of Review*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 99 S.Ct. 2781].)" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

### 2. *Kidnapping for Robbery*

Penal Code section 209, subdivision (b)(1) provides, "Any person who kidnaps or carries away any individual to commit robbery . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." A defendant may be convicted of kidnapping for robbery when the

kidnapping and the intended robbery pertain to different victims. (*People v. Zurica* (1964) 225 Cal.App.2d 25, 32 [37 Cal.Rptr. 118].) Thus, a defendant commits a kidnapping for robbery (or "aggravated kidnapping") if the defendant kidnaps one individual in order to prevent that person from spreading an alarm about a simultaneous robbery of a second person. (*Ibid.*)

The asportation element of kidnapping for robbery is further defined in subdivision (b)(2) of Penal Code section 209. That subdivision provides, "This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." This language is a codification of a rule set forth in *People v. Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225] (*Daniels*).[4] To better understand the requirements of the asportation element, it is important to recognize the rationale motivating the *Daniels* court.

In *Daniels*, the court was concerned with three counts of kidnapping for robbery, with an additional allegation of bodily harm. At the time of the offenses in *Daniels*, kidnapping for robbery when the victim suffered bodily harm subjected the defendant to the death penalty or life imprisonment without the possibility of parole. (*Daniels, supra*, 71 Cal.2d at p. 1125.) Each count in *Daniels* arose from a home invasion robbery/rape, in which the defendants entered the victim's home and moved her through her home in order to find money and commit sexual assaults. (*Id.* at pp. 1124–1125.) The defendants "had no interest in forcing their victims to move just for the sake of moving; their intent was to commit robberies and rapes, and the brief movements which they compelled their victims to perform were solely to facilitate such crimes." (*Id.* at pp. 1130–1131.) The California Supreme Court was concerned that the Legislature had not intended such incidental movements to constitute asportation sufficient to establish kidnapping. (*Id.* at p. 1131.) Indeed, the court was concerned with abusive prosecutions in which overzealous prosecutors could subject a defendant to the death penalty for a rape or robbery simply because the defendant happened to move his victim incident to the underlying offense. (*Id.* at p. 1138; *People v. Stathos* (1971) 17 Cal.App.3d 33, 37–38 [94 Cal.Rptr. 482].) Therefore, the court concluded that Penal Code section 209 not only excluded "standstill" robberies from its scope, "but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of

---

[4] As discussed below, there is one difference between the rule of *Daniels* and the language of Penal Code section 209, subdivision (b)(2).

robbery itself."[5] (*Daniels, supra*, 71 Cal.2d at p. 1139.) In other words, *Daniels* "construed [the aggravated kidnapping statute] to preclude convictions based on movement of the victim that is criminologically insignificant." (*In re Crumpton* (1973) 9 Cal.3d 463, 466 [106 Cal.Rptr. 770, 507 P.2d 74].)

■ The *Daniels* test is considered a two-part test. First, " '[i]n determining "whether the movement is merely incidental to the [underlying] crime . . . the jury considers the 'scope and nature' of the movement. [Citation.] This includes the actual distance a victim is moved. However, . . . there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong." [Citations.]' [Citation.]" (*People v. Washington* (2005) 127 Cal.App.4th 290, 297 [25 Cal.Rptr.3d 459].) "Incidental" means "that the asportation play no significant or substantial part in the planned [offense], or that it be a more or less ' "trivial change[] of location having no bearing on the evil at hand." ' " (*People v. Ellis* (1971) 15 Cal.App.3d 66, 70 [92 Cal.Rptr. 907].) " ' "The second prong of the *Daniels* test refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime]. [Citations.] This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased. [Citations.]" [Citations.]' [Citation.]" (*People v. Washington, supra*, 127 Cal.App.4th at p. 297.) The two elements of the test are related; "whether the victim's forced movement was merely incidental to the [underlying offense] is necessarily connected to whether it substantially increased the risk to the victim." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 [47 Cal.Rptr.3d 575, 140 P.3d 866].) "[E]ach case must be considered in the context of the totality of its circumstances." (*Ibid.*)

■ Standing alone, the fact that the movement of a robbery victim *facilitates* a robbery does not imply that the movement was merely incidental to it. The Supreme Court rejected this contention in *In re Earley* (1975) 14 Cal.3d 122, 130 and footnote 11 [120 Cal.Rptr. 881, 534 P.2d 721], concluding that a substantial movement made solely to facilitate a robbery is not incidental to it, but an insubstantial facilitating movement would be. Similarly, a movement of the victim that is *necessary* to the robbery might or might not be merely incidental, based on the circumstances. (See *People v. Washington, supra*, 127 Cal.App.4th at p. 299 [movement of bank employees inside the bank to the vault was necessary in order to obtain the money *and* was merely incidental to the robbery]; *People v. Stathos, supra*, 17 Cal.App.3d

---

[5] Penal Code section 209, subdivision (b)(2), enacted in 1997, codifies this rule, except that it does not require that the movement "substantially" increase the risk of harm to the victim. (*People v. Martinez* (1999) 20 Cal.4th 225, 232, fn. 4 [83 Cal.Rptr.2d 533, 973 P.2d 512].)

at p. 39 [driving restaurant owner from his home to his restaurant in order to obtain money at the restaurant was necessary in order to obtain the money *and* was not merely incidental to the robbery].)

In *People v. Corcoran*, (2006) 143 Cal.App.4th 272 [48 Cal.Rptr.3d 851], the court upheld an aggravated kidnapping conviction in which the movement of the victims occurred *after* the attempted robbery had been aborted. The court concluded that "the movement of the victims had nothing to do with facilitating taking cash from the [establishment]; defendant and his accomplice had aborted that aim, and their seclusion of the victims in the back office under threat of death was clearly 'excess and gratuitous.' " (*Id.* at pp. 279–280.) In other words, the court in *Corcoran* held that a movement that was *unnecessary* to the target offense and *did not facilitate* it was not merely incidental to it. Defendant argues from this premise that a movement which was necessary to, and facilitative of, a robbery must necessarily have been merely incidental to it. The conclusion is logically erroneous and legally unsound. *Corcoran*'s holding was simply that a movement that is *not* necessary to a robbery is also *not* merely incidental to it.[6] Defendant argues that a movement *necessary* to the robbery must therefore be merely *incidental* to it. This is the *inverse* of the *Corcoran* holding, which does not logically follow from the statement itself.[7] The cases cited above provide the necessary counterexample. A movement necessary to a robbery may or may not be merely incidental to it. Lack of necessity is a sufficient basis to conclude a movement is not merely incidental; necessity alone proves nothing.[8]

A conviction of kidnapping for robbery requires an increase in the harm to the victim beyond that contained in a hypothetical standstill robbery, where the risk of harm "arises from the perpetrator's use of force or fear, and from brief movements incidental to the robbery." (*People v. Jones* (1997) 58 Cal.App.4th 693, 714 [68 Cal.Rptr.2d 506].) "The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the *forced movement*." (*People v. Dominguez, supra*, 39 Cal.4th at p. 1152, italics added.) As a general rule, "when in the course of a robbery a defendant does

---

[6] Indeed, a movement unnecessary to a robbery is not incidental to it at all.

[7] That the inverse of a true statement is not necessarily true is easy to see by example. The statement, "if an animal is a collie, it is a dog" is true. Its inverse, "if an animal is not a collie, it is not a dog," is untrue, as there are many other breeds of dog. Similarly, the statement, "if there are not clouds in the sky, it is not raining" is true, but its inverse, "if there are clouds in the sky, it is raining" is not.

[8] A similar logical error appears in *People v. Hoard* (2002) 103 Cal.App.4th 599, 605–606 [126 Cal.Rptr.2d 855], in which the court criticizes another case, *People v. Salazar* (1995) 33 Cal.App.4th 341 [39 Cal.Rptr.2d 337], which held that a movement that was not necessary to the commission of a rape was not incidental to it. The *Hoard* court states, "Stated affirmatively, according to *Salazar*, necessary movement is incidental movement." (*Hoard, supra*, at p. 605.) The conclusion simply does not follow.

no more than move his victim around inside the premises in which he finds him . . . his conduct generally will not be deemed to constitute [aggravated kidnapping]." (*Daniels, supra,* 71 Cal.2d at p. 1140.) This is true whether the robbery is residential or commercial. This is because "that robbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises." (*People v. Washington, supra,* 127 Cal.App.4th at p. 300.)

There is no rigid "indoor-outdoor" rule by which moving a victim inside the premises in which he is found is *never* sufficient asportation for kidnapping for robbery while moving a victim from inside to outside (or the reverse) is *always* sufficient. (*People v. Timmons* (1971) 4 Cal.3d 411, 415 [93 Cal.Rptr. 736, 482 P.2d 648].) Nonetheless, it has often been held that defendants who have moved their victims within the premises in which they were found did not increase the risk to the victims (*People v. Washington, supra,* 127 Cal.App.4th at p. 299 [bank manager and teller briefly moved from public area of bank to vault room in order to open vault]; *People v. Hoard, supra,* 103 Cal.App.4th at pp. 602, 607 [jewelry store employees bound in back office to give defendant free access to the jewelry in the store]), while defendants who moved their victims to more secluded or enclosed areas did substantially increase the risk (*People v. Dominguez, supra,* 39 Cal.4th at p. 1153 [victim moved from a relatively open area alongside the road to a place significantly more secluded, decreasing the possibility of detection, escape or rescue]; *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1048 [16 Cal.Rptr.3d 231] [victim moved 133 feet into unlit area where there was less likelihood of detection]; *People v. Jones* (1999) 75 Cal.App.4th 616, 629 [89 Cal.Rptr.2d 485] [victim in parking lot moved 40 feet in order to push her into a car, removing her from public view and increasing the risk defendant could drive away with victim]; *People v. Hill* (1971) 20 Cal.App.3d 1049, 1052–1053 [98 Cal.Rptr. 214] [defendant robbing supermarket moved customers from the parking lot into the market; defendant fired his gun inside the market, which he would not have done in the open parking lot].)

### 3. *Kidnapping of Gonzalez*

In this case, there was substantial evidence of the following events. Gonzalez was outside the Bingo Club hosing down the parking lot. He was approached by at least two men, one of whom was armed. The men forced him, at gunpoint, an unknown distance to the door of the Bingo Club. Under the direction of the robbers, Gonzalez knocked on the door, said "It's me," and gained entrance. The robbers did not release Gonzalez at this point, but threw him to the floor instead. Gonzalez and the other workers remained on the floor while defendant robbed Hines in the cage, defendant took Hines to the office to shut off the security cameras, defendant allowed Hines to

telephone Lazar, the robbers waited for Lazar to arrive, and the robbers subsequently robbed Lazar in the cage. Gonzalez remained in this position—with a single change of location inside the Bingo Club—for an amount of time that may have been as long as an hour. During this time, the robbers continued to point a gun at Gonzalez, and may have taken personal property from him. Thereafter, he was forced with the others into a bathroom while the robbers escaped.

Defendant contends this factual scenario does not satisfy either prong of the *Daniels* test. We first consider whether Gonzalez's movement was merely incidental to the underlying offense. Defendant argues that it was. He notes that the prosecution failed to establish that Gonzalez was moved a substantial distance *outside* the Bingo Club, prior to being brought to the door. Further, defendant argues that the movement of Gonzalez from the outside of the Bingo Club to the inside was merely incidental to the robbery, in that Gonzalez simply functioned as a means to enable the robbers to gain entry to the Bingo Club in order to rob it. As set forth above, there is no minimum distance that a victim must be moved in order to establish that the movement was not merely incidental to the underlying crime; what matters is the scope and nature of the movement. It is significant here that the underlying crime was *not* the robbery of Gonzalez, but the robbery of the Bingo Club. In other words, defendant did not seek to rob Gonzalez of property kept inside the Bingo Club and simply moved him from the outside of the Bingo Club to the location of the property inside. Instead, defendant and his companions intended to rob the *manager* of the Bingo Club, and moved Gonzalez from the outside of the Bingo Club to the door, in order to gain entry. Once Barrera had opened the door, defendant's purported purpose in moving Gonzalez had been fulfilled, but the kidnapping continued. Gonzalez was *then* forced inside the Bingo Club and thrown to the floor with the other workers, where he remained throughout the robbery. While "that robbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises" (*People v. Washington, supra*, 127 Cal.App.4th at p. 300), the robbery of a business employee *does not* include the risk that *other* individuals will be moved, at gunpoint, from the relative safety of the outdoors, into the business premises for the duration of the robbery.

Similarly, we conclude the second element of the *Daniels* test was also satisfied. The movement of Gonzalez substantially increased the risk of harm to Gonzalez. He was brought from the outside of the Bingo Club to the enclosed inside, reducing the prospects of detection or escape.[9] By being held inside the Bingo Club during the robbery, there was an increased risk that

---

[9] Defendant argues there was no evidence anyone could have seen Gonzalez had he been permitted to remain in the parking lot, as the prosecution did not introduce evidence that the

Gonzalez himself would have been robbed (as were Barrera, Gomez and Martinez), or physically assaulted (as were two workers during the August 4, 2002 robbery). Moreover, "a kidnap victim's peril ordinarily grows with the passage of time and distance." (*People v. Stathos, supra*, 17 Cal.App.3d at p. 39.) As Gonzalez's captivity continued while the robbers were busy with Hines and Lazar, the risk to Gonzalez increased, as he remained held at gunpoint.

Our conclusion is reinforced by the rationale behind *Daniels*. This is not a case where Gonzalez was himself robbed, and defendant is charged with kidnapping Gonzalez due to some trivial, criminologically insignificant movements of Gonzalez that were incidental to that robbery. Instead, the underlying offense was the robbery of the managers of the Bingo Club. That defendant and his associates chose to commit this robbery by the means of bringing Gonzalez, at gunpoint, to the door of the Bingo Club does not make the movement of Gonzalez merely incidental to the robbery; it means that defendant committed the robbery by means of a kidnapping, and was therefore properly convicted of aggravated kidnapping.

We note that we have not reached this conclusion based solely on the simple fact that Gonzalez was forcibly moved from an outdoor location to an indoor one.[10] We have instead considered the totality of the circumstances and concluded that the entirety of the movement of Gonzalez was not merely incidental to the robbery of the Bingo Club managers, and substantially increased the risk of harm to Gonzalez over and above that in the underlying robbery. We therefore affirm.

---

parking lot was not itself enclosed. Yet Lazar arrived at the Bingo Club at some point during the course of the robbery; Gonzalez could have alerted Lazar had Gonzalez not been brought inside the Bingo Club.

[10] In his reply brief on appeal, defendant relies on three cases in which our Supreme Court held aggravated kidnapping convictions were not supported by the evidence, even though the victims had been moved from an outside location to one less open to public view. (*In re Crumpton, supra*, 9 Cal.3d 463 [service station attendant was forced to lie down behind a truck on the station premises]; *People v. Killean* (1971) 4 Cal.3d 423, 424 [93 Cal.Rptr. 742, 482 P.2d 654] [victims caused "to move across the threshold and through various rooms in search of valuables"]; *People v. Williams* (1970) 2 Cal.3d 894 [88 Cal.Rptr. 208, 471 P.2d 1008] [service station attendant moved inside service station area, including areas that were outdoors].) We do not quarrel with the proposition that moving a victim from an outside location to a less open one does not *in and of itself* establish the movement was not merely incidental and substantially increased the risk of harm. That is not this case.

## DISPOSITION

The judgment is affirmed.

Klein, P. J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 13, 2007, S151587.