Filed 7/21/15  P. v. Deen CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>VINCENT ALEXANDER DEEN,<br><br>  Defendant and Appellant. | F067586<br><br>(Fresno Super. Ct. No. F11907197)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Matthew H. Wilson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and David A. Lowe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Vincent Alexander Deen and his friend, Jamar Mayo, burglarized the home of 68-year-old, Jennie Molina.[1]  During the course of the burglary, Jennie was gagged and bound at the hands and legs.  Deen and Mayo then carried her from the house to an attached garage and placed her in the trunk of her car.  Defendant contends this movement of the victim was "merely incidental" (Pen. Code, § 209, subd. (b)(2))[2] to the robbery, and therefore his conviction for aggravated kidnapping must be reversed.  We disagree.  There was substantial evidence that the movement of the victim was not necessary to complete the burglary.  Since " '[a] movement unnecessary to a robbery is not incidental to it at all[,]' " the jury had a sufficient basis to conclude the movement here was not merely incidental.  (*People v. Leavel* (2012) 203 Cal.App.4th 823, 835.)

We order a minor correction to the abstract of judgment, and affirm.

## BACKGROUND

Defendant was charged with kidnapping to commit robbery (count 1 – § 209, subd. (b)(1)), elder abuse (count 2 – § 368, subd. (b)(1)), first degree residential robbery (count 3 – § 211), first degree residential burglary (count 4 – §§ 459/460, subd. (a)), and false imprisonment of an elder adult (count 5 – § 368, subd. (f).)  As to each count, the information alleged that defendant personally inflicted great bodily injury.  (§ 12022.7, subd. (a).)  As to counts 1, 3, and 4, it was alleged that the victim was an elder adult within the meaning of section 667.9, subdivision (a).  As to count 4, it was alleged that a nonaccomplice was present in the residence during the burglary.  (§ 667.5, subd. (c)(21).)  As to count 2, it was alleged defendant personally inflicted great bodily injury.  (§ 368, subd. (b)(2).)

---

[1] We refer to Jennie Molina by her first name to distinguish her from her daughter, Delia.  No disrespect is intended.

[2] All further statutory references are to the Penal Code unless otherwise stated.

A jury convicted defendant on all counts and found all enhancement allegations true. The court sentenced defendant to 10 years, plus a consecutive life term with the possibility of parole.[3] The sentence included 6 years for first degree residential burglary conviction, plus 3 years for the serious bodily injury enhancement, plus 1 year for the elder victim enhancement, plus life with the possibility of parole on the kidnapping to commit robbery conviction. The court sentenced defendant to a concurrent term of four years on the elder abuse conviction. All other counts and enhancements were stayed or stricken.

**FACTS**

On December 19, 2011, 68-year-old Jennie Molina was living in a three-bedroom home in Fresno, California. Jennie's daughter Delia, and Delia's sons, Louie and Gene, also lived in the home.

Gene and defendant were friends from high school. After they graduated, defendant lived at Jennie's home for about three months beginning in the fall of 2010.

Sometime in the three weeks before December 19, 2011, defendant's friend, Jamal Mayo, came to Jennie's door. Mayo said his car had broken down and that he wanted to use her phone. Jennie said she would make the call for him, and he said the phone number was in his car. He left (presumably to get the phone number), but did not return. Jennie told Delia to inform the neighbors of the incident because Mayo may have been "casing" the house.

On December 19, 2011, Jennie returned home from a funeral at around 2:00 p.m. About 20 minutes later, Mayo came to her front door and asked if Gene was home. Jennie informed him that Gene was at work. Mayo said Gene owed him money and was not returning his calls. Jennie reiterated that Gene was at work, not at home. Mayo left.

---

[3] The abstract of judgment also reflects that defendant was sentenced a consecutive term of one-year in prison in a separate case.

Five minutes later, Jennie saw Mayo sitting on the curb across the street. Jennie had planned to leave her home, but decided to stay once she saw Mayo because she "didn't know whether he was planning to rob [her] house."

Mayo came back to Jennie's door. Jennie opened one of her front doors, but left a screen door closed and locked. Mayo said he wanted to leave his phone number for Gene to call him. Jennie went back to her bedroom where she kept paper and a pencil. As she went to her bedroom, she was grabbed from behind.[4] She struggled to get loose and asked the person what he wanted. The person did not answer. Jennie testified she "evidently" passed out.

The next thing Jennie knew, she was face down on the floor in her bedroom. She started yelling for help. Someone put their hand on her mouth. She repeatedly tried to move the person's hand, but the person would keep replacing it on her mouth. The person then put a rag in Jennie's mouth. The rag had "an odor" and Jennie said she "evidently … blacked out again." When she regained consciousness, the person was choking her. She again lost consciousness.

After regaining consciousness, Jennie realized she was being carried by two people. She could not see who has holding her upper body, but saw that the person holding her legs was Mayo. Mayo had a backpack and was holding gray masking tape in his right hand.

One of the two men taped Jennie's mouth, hands and feet. Jennie again lost consciousness. She "lightly" perceived being carried to her car in the garage. The men placed her in the trunk of her car and closed it. Jennie's mouth, hands and feet were still taped. She was frightened and thought someone wanted her dead. Because her hands were bound in front, Jennie was able to pull some tape off of her mouth. She tried to use

---

[4] According to defendant's post-arrest statement to law enforcement, Mayo was able to enter the house because defendant opened the front door for him. However, Jennie did not know if it was Mayo who had grabbed her.

a knife in the trunk to cut the tape off her hands, but to no avail. She also tried to chew through the tape on her mouth for "maybe" half an hour.

At around 3:00 or 3:30 p.m., Delia returned home with her son, Louie. Delia could not get into the house, so she had Louie jump through a window and open the front door. Louie noticed the kitchen door was open.

Delia saw that Gene's room "was all messed up" and his television was gone. There was a basket on Gene's bed with all of his video games inside.

Delia saw a bloody shirt on Jennie's bed and smelled bleach. She started to panic. She went outside to call her boyfriend and "all of a sudden" defendant appeared. Delia asked defendant what he was doing. Defendant said he was playing basketball with a friend. Delia told him something "[wasn't] right" in her house, and he told her to call the police.

According to Delia, at some point[5] Mayo came to the door wearing a pink backpack and said his name was Robert.[6] Mayo told Delia he knew her son, Gene, and that Gene owed him money. He asked if he could come in to use the restroom and get a drink of water. Delia let him in, and he went to the bathroom. At some point Mayo also went into one of Delia's son's rooms. Delia then asked him to leave.

Delia called 911 and the police arrived shortly thereafter. A responding officer immediately smelled bleach. The officer also found a balled-up piece of tissue with blood on it between the living room and the hallway.

---

[5] It is unclear whether Mayo came to the door and identified himself as Robert before or after Delia encountered defendant.

[6] A neighbor testified she saw defendant and Mayo standing at the gate of a nearby apartment complex for five minutes. According to the neighbor, it was *defendant* who had a pink backpack. The neighbor saw the two men knock on Jennie's door, but no one answered so they walked away.

When Jennie heard voices, she yelled and "banged on" the car from inside the trunk. A responding officer heard the noises and found her. Officers also found Gene's television in the back seat of the car.

Jennie's top was bloody, her eye was swollen shut, she had two broken fingers, and multiple bruises. She was taken to the hospital. Jennie had a cast on her arm for about six weeks and did not regain full use of her right arm for "almost a year."

Officers found no sign of forced entry at the front door. However, a window screen from a back window of the home was found leaning against a fence. Defendant's fingerprints were found on the screen.

Wesley Thomas

Wesley Thomas testified that he knew Mayo and "kind of" knew defendant.

One day Thomas saw defendant with blood on his sweatshirt. Around that time, Mayo and defendant were at Thomas's house. Thomas overheard Mayo and defendant talking. Defendant said "that he beat the lady, like he kept punching her." Defendant said he and Mayo were going to "put the TV in the car and take the car." Later that day, Thomas spoke with police.

Thomas also described other statements defendant made. However, the timing of when defendant made these particular statements is unclear. For example, Thomas testified defendant said something about entering a house through a window.[7] Defendant also spoke to Thomas of "robbing somebody" and "[a]bout putting the lady in the trunk." Mayo also admitted to being part of the burglary.

Defendant left a pink backpack at Thomas's house.

---

[7] The chronology of when defendant made this statement is ambiguous because the question posed by the prosecutor was: "Did Mr. Deen at any point tell you how he was *going to get* into a house or how he *had gotten* in to that house?" (Italics added.) Thomas responded, "It was through the side window."

Defendant's Postarrest Statement to Law Enforcement

Defendant was arrested days later. After his arrest, defendant spoke with law enforcement investigators. Initially, defendant said that he did not know what happened "to that lady." Defendant said he and Mayo went to Gene's house to invite him to smoke with them. Defendant knocked on the door to Gene's house and left when no one answered. Later, defendant realized he had left his cell phone at a friend's house[8] and went to retrieve it. When he went to the friend's house, he saw Delia and Louie. Louie brought him into the house and showed him a bloody napkin, bloody clothes, Gene's room and a screen door.

One of the interviewing investigators told defendant that Mayo was cooperating, and that it was in defendant's best interests to do the same. Eventually, defendant admitted going to Jennie's house with Mayo to see Gene. Defendant claimed no one was at the house, so they left. Mayo began talking about going inside Jennie's house to steal "whatever he could get his hands on." Defendant said it would be dangerous, but Mayo "had something on" him and said defendant owed him one. So, defendant agreed to help Mayo. Defendant's job was to get into the house and open the door.

Defendant hopped the fence and went into the house through Louie's bedroom window. Mayo told him that Jennie had returned home, so defendant hid in Louie's closet for 20 minutes.[9]

Mayo sent him a text message telling him to hurry. Defendant told Mayo he needed a distraction. Mayo wanted defendant to "knock her out," but defendant refused. Mayo then knocked on the door and gave Jennie a fake name. Jennie went to the kitchen

_____

[8] Defendant repeatedly refused to tell investigators the name of the friend or the location of the house.

[9] At one point in the interview, defendant said he left the house when Jennie returned home, and later returned. But later in the interview, defendant said he hid in a closet when Jennie returned home.

7.

and defendant opened the door for Mayo. Jennie saw Mayo and screamed, so Mayo covered her mouth. Mayo told defendant to hold her down, so he did, "gentl[y]." Jennie was crying and screaming.

Defendant retrieved tape from a pink backpack Mayo had with him. Then, Mayo wrapped Jennie's mouth, hands and feet with tape. Jennie tried to scratch Mayo but missed him and hit defendant.

Defendant then "cleaned up all the blood" with bleach. Defendant had not hit Jennie, and all the blood came from where Mayo was. While defendant was cleaning the blood, Mayo tried to take a television and unhook an X-box.

Mayo saw Delia returning home. So Mayo and defendant dragged Jennie and put her in the trunk of her car in the garage. Mayo then took a television and put it in the backseat of the car.

Mayo said they "couldn't leave the body."[10] Mayo and defendant discussed taking the car and leaving. Defendant thought Mayo was going to kill Jennie, take her car, and dispose of her body.

Defendant stayed in the garage for 30 minutes, scared and not moving. Mayo had left the backpack – which had his cell phone inside – on the living room couch inside. Mayo went out the garage door, hopped over the fence and acted "like he [had] never been there." Mayo spoke to Delia, asked for something to drink and to use the restroom. Delia allowed him in, so he retrieved the backpack and the duct tape.

After Mayo left, defendant did not know what to do, so he also left. As defendant was walking away from the house, he caught Louie's eye. Defendant decided to talk to Louie, who showed him around the house.

---

[10] Earlier in the interview, defendant claimed he had asked if they were "just going to leave her here now like this," and Mayo had responded affirmatively.

Defendant told investigators he had duct tape in his backpack because he "carr[ies] everything with [him]." Defendant also mentioned that after the incident, Mayo's father called him and told him to tell the truth.

Defendant's Trial Testimony

Defendant testified at trial that Mayo's father had told him he had to "add my part to it to get his son off." Mayo's father said that "since he was hurting, he would make [defendant] hurt in a way if not personal, by family members." Defendant claimed at trial that he had told investigators an incorrect version of events because of Mayo's father's threats.

Defendant proceeded to testify to a different series of events than reflected in his postarrest interview.

Defendant and Mayo met up at a friend's house, smoked and got "high." The friend's house was near Gene's, so defendant began to think of him. Defendant thought to invite Gene to smoke with them so they could "clear things up."

Defendant and Mayo made their way to Gene's house. Defendant knocked on the door, but no one answered. Defendant asked a neighbor if she had seen Gene, but she had not so they left.

Mayo came up with the idea of burglarizing Gene's home. Defendant said he would not do it.

Jennie returned home, and Mayo knocked on her door. Jennie answered and said Gene was not home. Mayo tried Jennie's door again. Jennie opened the front door, but left a screen door closed. Mayo then opened the screen door and walked into the house.

Defendant waited across the street for five or six minutes and then called Mayo. Mayo did not answer the first time, but did answer the second time.[11] The two

---

[11] Defendant initially testified that Mayo missed his first call and then *Mayo* called *him* back. Defendant's counsel then immediately asked him: "So [Mayo] misses the first

9.

exchanged text messages, and Mayo told defendant to come across the street. Defendant looked through the front door and saw Jennie on the floor. Mayo waived defendant in and said, "Let's get some stuff." Defendant refused and went back across the street again.

The two began exchanging text messages again. Defendant told Mayo he was "over his head" and that he should "leave now." Mayo responded that he was almost done, and defendant should wait for him.

When defendant saw Delia return home, he sent a text message to Mayo to warn him. Mayo closed the front door. From across the street, defendant saw Delia lift Louie over the fence.[12] Minutes later, defendant saw Mayo hop the fence, then return to the front door. Delia then let Mayo into the house. After about 10 minutes, Mayo exited the house and told defendant, "Let's go, let's go."

Defendant asked Mayo what he had done, and Mayo gave him a "brief explanation." Defendant said, "You can't just leave someone. Is she all right?" Mayo said, "Just forget about her." Nonetheless, defendant went back to talk with Delia. Delia told him she was worried because things in the house were different. Louie and Delia walked defendant through the house, telling him what was missing. Defendant saw blood on the floor and tissues. Defendant also saw a window screen and moved it out of the way. Defendant then crossed the street and met up with Mayo.

Cell Phone and Tower Evidence

Cell tower records indicate that defendant's phone was somewhere near Jennie's home on the date of the burglary. However, the cell tower data did not provide an exact

---

call you made and then *you called him again*?" (Italics added.) Defendant testified, "Yes."

[12] Delia testified that she did not have a key to the house and relied on her mother to let her in. When Delia returned home that day and discovered the door was locked, she had Louie go through the kitchen door and unlock the front door.

location of defendant's phone.  Defendant's phone could have been up to a quarter-mile or more away from the street where Jennie's house was located.

Several text messages from December 19, 2011, were deleted from defendant's phone.  Defendant blamed the deletions on Mayo.

DNA Evidence

Criminalists examined fingernail scrapings taken from Jennie.  In one scraping, there was only female DNA.  In another fingernail scraping, and on a piece of duct tape from the scene, very low levels of male DNA were found.  However, there was not enough male DNA to include or exclude anyone as a possible contributor.

## DISCUSSION

### I.  THERE WAS SUBSTANTIAL EVIDENCE THE MOVEMENT OF THE VICTIM WAS "BEYOND THAT MERELY INCIDENTAL" TO THE ROBBERY

In count 1, defendant was charged with kidnapping Jennie to commit robbery in violation of section 209, subdivision (b)(1).)  That provision makes it a felony to "kidnap[] or carr[y] away any individual to commit robbery .…"  (§ 209, subd. (b)(1).)  As relevant here, the provision "only appl[ies] if the movement of the victim is beyond that merely incidental to the commission of" the robbery.[13]  (§ 209, subd. (b)(2).)  Defendant contends that "the short distance he and Mayo carried [Jennie] was 'merely incidental to' the commission of the intended robbery."  As a result, he contends there was insufficient evidence of his conviction for violating section 209, subdivision (b)(1).)  We disagree.

---

[13] Subdivision (b)(2) also requires that the movement "increase[] the risk of harm to the victim over and above that necessarily present[] in the intended underlying offense."  (§ 209, subd. (b)(2).)  However, defendant concedes the sufficiency of the evidence on this issue.

11.

A.  Substantial Evidence Review

"When assessing a challenge to the sufficiency of the evidence, the reviewing court must decide whether the record contains substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the entire record in the light most favorable to the judgment and presume in its support the existence of every fact the trier could reasonably have deducted from the evidence.  [Citation.]"  (*People v. Robertson* (2012) 208 Cal.App.4th 965, 982–983.)

B.  Incidental Movement

The question we face is whether the movement of the victim was "beyond that merely incidental to the commission of [the robbery]."  (§ 209, subd. (b)(2).)

" '[A] movement unnecessary to a robbery is not incidental to it at all.' [Citations.]"  'Lack of necessity is a sufficient basis to conclude a movement is not merely incidental ….'  [Citation.]"  (*People v. Leavel*, *supra*, 203 Cal.App.4th at p. 835, fn. omitted.)

Here, there was substantial evidence the movement of the victim was not necessary to commit the robbery.  The victim was 68 years old at the time of the incident.  Before being moved to the garage, the victim had already been gagged, and her legs and hands bound with duct tape.  The jury could have reasonably concluded that once the elderly victim had been gagged and bound, it was unnecessary to move her into the garage to complete the robbery.  Since there was substantial evidence the movement was not necessary to complete the robbery, the jury had a "sufficient basis to conclude [the] movement [was] not merely incidental" to the robbery.  (*People v. Leavel*, *supra*, 203 Cal.App.4th at p. 835)

Defendant argues that "perhaps most important, the movement was entirely within the house and attached garage."**[14]** However, "[t]here is no rigid 'indoor-outdoor' rule by which moving a victim inside the premises in which he [or she] is found is *never* sufficient asportation for kidnapping for robbery while moving a victim from inside to outside (or the reverse) is *always* sufficient. [Citation.]" (*People v. James* (2007) 148 Cal.App.4th 446, 456, italics in original.) The dispositive fact is that the jury had a reasonable basis to conclude the movement of the victim was unnecessary to complete the robbery and was therefore not merely incidental.

Defendant also argues that the movement involved was "not a long distance, about 57 feet total." However, there is no minimum distance a defendant must move a victim to satisfy the "beyond … merely incidental" requirement. (*People v. Vines* (2011) 51 Cal.4th 830, 870.) The dispositive issue here is not the length of the movement, but instead the substantial evidence the victim's movement was unnecessary to complete the robbery.

## II.     THE ABSTRACT OF JUDGMENT SHOULD BE CORRECTED

The abstract of judgment incorrectly indicates that defendant was convicted of first degree residential burglary in count 3. In reality, defendant was convicted of first degree residential robbery in count 3. The Attorney General concedes the abstract should be amended accordingly.

### DISPOSITION

The trial court is directed to correct the abstract of judgment to reflect that defendant was charged with and convicted of first degree residential robbery in count 3, not first degree residential burglary. The trial court is also directed to forward copies of

---

**[14]** We have previously found movement that occurs completely *within* a garage to be "beyond … merely incidental" (§ 209, subd. (b)(2)) for purposes of kidnapping to commit rape. (*People v. Robertson*, *supra*, 208 Cal.App.4th at p. 986.)

13.

the amended abstract to all appropriate parties and entities.  In all other respects, the judgment is affirmed.

 

 

_____

POOCHIGIAN, Acting P. J.

WE CONCUR:

_____

DETJEN, J.

_____

PEÑA, J.