Filed 3/30/15  P. v. Burnes CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rule s of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B251900 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA059304) |
| v. | |
| PIERCE LANGSTON BURNES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Mangay Chung, Judge.  Affirmed.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Pierce Burnes was convicted by a jury of two counts of aggravated kidnapping (Pen. Code,[1] § 209, subd. (b)(1)) and three counts of second degree robbery (§ 211) in connection with the robbery of an AT&T store on April 11, 2013 and the robbery of a Radio Shack store on March 30, 2013. Burnes was also convicted of a separate attempted robbery (§§ 211, 664) on April 11, 2013. The court found true the allegation that Burnes had a prior conviction for a violent or serious felony under the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and one prior serious felony conviction within the meaning of section 667, subdivision (a)(1). The court sentenced Burnes to an aggregate state prison term of 28 years to life plus a determinate term of 26 years and four months.

Burnes only challenges his kidnapping convictions on appeal. At issue is whether the acts by Burnes at each store after taking the merchandise to move his victim to a location in the store not in the public view, then tying up the victim, was "incidental to the [crime of] robbery," and whether the movement "increase[d] the risk of harm to the victim over and above that necessarily present" in the robbery. Burnes contends that there was insufficient evidence of asportation because all of the forced movement was "incidental to the robbery."

We find that Burnes's movement of the victims in each robbery to locations not in the public view where he tied them up decreased the likelihood the victims would be discovered and increased the psychological harm to them, thus satisfying the asportation element of kidnapping as set forth by our Supreme Court in *People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 (*Dominguez*). We affirm.

---

[1]     All statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL AND PROCEDURAL BACKGROUND

## A. *The Information*

Burnes was charged in an amended information with co-defendant Donte Ray with five counts relating to the April 11, 2013 robbery of an AT&T store, including kidnapping to commit robbery (or "aggravated kidnapping") of Ilene Solaiza (§ 209, subd. (b)(1); count 1), second degree robbery of Phillip Reid (§ 211; count 2), second degree robbery of Solaiza (§ 211; count 3), false imprisonment by violence of Reid (§ 236; count 4), and false imprisonment by violence of Solaiza, as a lesser included offense of count 1 (§ 236; count 5). Burnes was also charged with the attempted second degree robbery of Taryn Owsley for a separate robbery on the same date (§§ 211, 664; count 6).

The information also charged Burnes with three counts relating to the March 30, 2013 robbery of a Radio Shack store, including kidnapping to commit robbery of Stephanie Contreras (§ 209, subd. (b)(1); count 7), second degree robbery of Contreras (§ 211; count 8), and false imprisonment by violence of Contreras, as a lesser included offense of count 7 (§ 236; count 9).

The information alleged as to counts 1 through 9 that Burnes had a 2005 serious or violent felony conviction for rape under the three strikes law (§§ 667, subds. (a)(1), (b)-(i), 1170.12) and, as to the same prior conviction, with respect to counts 1 through 8, he had a conviction of a serious felony under section 667, subdivision (a)(1), and to counts 1 through 9 he had served a prior state prison term under section 667.5, subdivision (b).

On July 8, 2013 the court granted the prosecution's motion to sever the trial of the two defendants, and ordered that the trial as to Burnes would proceed to trial first. The jury trial commenced as to Burnes on July 10, 2013.

3

**B. *Trial Testimony***

1. *The Prosecution's Witnesses*

a. April 11, 2013 AT&T Robbery[2]

On April 11, 2013 Solaiza was the manager of an AT&T store on Commerce Center Drive in Lancaster. Solaiza and her co-worker Reid arrived at 9:45 a.m. to prepare the store for its 10:00 a.m. opening. About 15 minutes after Solaiza opened the store, Burnes and Ray entered the store together. Solaiza had never seen them before. They were both wearing "do rags" on their heads with baseball caps and sunglasses, and had black satchels across their chests. Burnes walked to the corner of the store where the iPhones were located, and asked Solaiza where the Otterbox accessories were located.

As Solaiza started walking toward the Otterbox display, Burnes pulled out a gun and pointed it at Solaiza's face. He told her to "get in the back." She believed it was a real gun.[3] Solaiza complied and walked toward the back, approximately 10 to 12 feet away. At the time, Reid was in the storage room in the back doing inventory. Reid heard Solaiza scream. When Solaiza reached the storage room,[4] Burnes told her to lie down on the floor, which she did, facing down.

One of the men also told Reid to get down on the floor, face down. Ray pulled keys and phones out of Reid's pockets and started to tie him up with duct tape. Burnes asked Solaiza for the store keys, and Solaiza directed him to the keys Ray had just taken. Burnes left, and Solaiza watched him on the security camera video lock the front door and return. Burnes then asked where the iPhones and iPads were. Solaiza told him they

---

[2]     We discuss the AT&T store robbery first because the evidence was presented at trial before the Radio Shack robbery and the parties likewise address it first.

[3]     As we discuss below, the gun was a replica firearm BB gun, but looked like a real gun.

[4]     The storage room in the back was at different times during Solaiza's testimony referred to as the "back room," the "storage room," and the "stockroom." We will refer to the room as the storage room.

4

were in the safe.  Burnes ordered Solaiza to get up and open the safe.  She opened the right side of the safe, then she lay down on the floor, face down.  Solaiza could see Burnes scooping up the phones from the safe and putting them into his black satchel.

Burnes next asked where the Samsung Galaxy phones were located, and Solaiza told him they were on the left side of the safe.  She got up again and unlocked the left side of the safe, then again lay down on the floor in the storage room.  Burnes also took about $500 in cash in the safe from the prior day.  Then Burnes asked where the "cash drawer" was.  Solaiza told him it was outside on the sales floor.  Burnes directed Solaiza to the cash drawer, holding a gun to her back.  The cash drawer was behind the second desk on the sales floor.  Solaiza opened the drawer, and Burnes took all the cash.  The cash was the last thing Burnes took from the store.  Burnes then ordered Solaiza back to the storage room, and told her to lie down on the ground.[5]

Burnes proceeded to tie Solaiza up with cables.  Burnes and Ray packed up the remaining merchandise they had taken into the satchels.  At this point, Solaiza was afraid, and "just wanted them to leave."  Solaiza still believed Burnes had a real gun, and did not know what was going to happen to her once she was tied up.  Burnes and Ray then left the storage room and closed the door behind them.  Reid jumped up and pushed the silent panic alarm on the safe.  About 15 to 30 seconds later, Burnes and Ray returned.  When they returned, Reid was standing at the safe, and Burnes asked Reid what he was doing.  Reid said that he was just helping Solaiza.  Burnes pushed Reid down on the floor and stepped on his back.  Burnes said to Reid, "I should kill you."  Burnes ripped off Reid's belt and tied him up with the belt and cables.

Solaiza told them that there was a side door they could use to leave.  The side door had a chime that went off when it was opened.  It was locked from the inside so Burnes

---

[5]    Solaiza testified that Burnes ordered her to the cash drawer at gunpoint, but did not recall whether he held a gun as he ordered her back to the storage room.  She did recall though that he told her to go back to the storage room and then ordered her to get back on the ground.

needed to use the store key to unlock it. Burnes unlocked the door, and he and Ray left. Solaiza and Reid waited about 30 to 45 seconds after Burnes and Ray left, then both proceeded to the front of the store.

Reid ripped off the bindings on his hands and walked to the window at the front of the store. Reid looked out the front window and saw Burnes and Ray attempting to steal a woman's car. He also saw the woman drive off, almost running over Burnes. At the same time, Solaiza dialed 911 and told the operator that she had just been robbed at gunpoint by two men who left on foot toward the International Mall.

Solaiza testified that Reid stayed in the storage room during the entire robbery. When describing the store, Solaiza said that behind the sales floor was a storage room with the safe. Behind the storage room was another room "way in the back," which is like a business office. According to Solaiza, the business office has windows that face 10th Street west, which is a busy street. The storage room had windows but they were painted with black paint so no one could see through them. The storage room and the bathroom were the only rooms with no windows to look out.


b. April 11, 2013 Attempted Robbery of Owsley

At around 10:15 a.m., Owsley went to the AT&T store to pay her phone bill, but the door was locked. She was waiting for the store to open when she saw two men come from around the corner of the building. Burnes approached her, wearing a hat, sunglasses, dark clothing, and gloves. Burnes said, "give me your phone." Owsley responded, "no." When Burnes asked her a second time, she said "no . . . it's a business phone." Owsley was scared of what he was going to do.

Burnes then walked over to Ray to talk to him. At that point, Owsley took out her car keys and walked toward her car, got in, and locked the doors. Burnes came over to the car and banged on her trunk with both hands. Owsley started her car, put it in reverse, "nudged" Burnes a little bit with the car, and Burnes jumped to the side. Burnes ran to the driver's side of the car and tried to open the car doors and banged on the car

6

windows.  Burnes told Owsley to get out of the car.  Instead, Owsley backed up "really fast and left."

As Owsley was driving, she called 911 and reported an attempted carjacking and that a man tried to take her phone.  Owsley told the operator that one of the men had a yellow and black cap and sunglasses.  This man was approximately 5 feet 8 inches, and maybe 160 pounds.  The second man was taller and bigger and appeared to be wearing black.  Both men had duffle bags.  Owsley said she saw them flee west toward the park.

### c.  Investigation of the April 11, 2013 Robberies

Los Angeles County Sheriff's Department Deputy Mark Donnel was assigned to the investigation of the AT&T robbery.  He responded to a radio call regarding the AT&T robbery and drove to the parking lot between the AT&T store and the International Mall, then drove south.  When he reached the park-and-ride lot he saw two people running, who were later identified as Burnes and Ray.  Donnel chased Burnes by car, then got out and chased him on foot.  Donnel and another deputy caught up with Burnes and detained him.

Los Angeles County Sheriff's Department Detective Dale Parisi heard two radio calls on April 11, 2013 at around 10:45 a.m., reporting an attempted carjacking and robbery of a store.  Parisi drove to the park-and-ride, where one suspect was already detained and the second one was running around in circles in the parking lot, trying to find a way out.  The second suspect (Ray) was also detained.

Deputy sheriffs transported Solaiza, Reid and Owsley separately to the park-and-ride lot to identify Burnes and Ray.  Solaiza testified that she was taken there about 30 minutes after the robbery.  Solaiza said that the men's facial features, height, weight and shoes looked familiar but they had different clothes on.

Reid testified that he was taken to identify the suspects about 15 to 20 minutes after the robbery.  Reid positively identified the two men shown to him.  He testified that they had on the same shoes but different clothes.  Owsley also identified the two men as

7

the men who attempted to take her phone and car, saying she was 100 percent sure it was the same men although they were wearing different clothes.

Two teams of officers proceeded to search for the property. Parisi learned that two duffle bags had been found under an older motor home on 1101 Auto Mall Drive, about one-eighth of a mile from the AT&T store. Parisi drove to the location to look at the duffle bags. One duffle bag contained AT&T iPhones and iPads, gloves, and a BB gun that was a "replica firearm." Parisi had to handle the BB gun to see that it was plastic. The second duffle bag contained approximately six Samsung, Nokia and other cell phones, about 30 cell phone cases, many Otterbox cases and a second replica firearm BB gun.

Parisi also recovered items from an area near where Burnes and Ray were detained, including a black and red baseball cap, a dark gray zip-up sweatshirt, two sets of gloves, and a gray shirt. Another deputy found a blue and yellow baseball cap under a nearby vehicle.

Burnes was later interviewed and admitted to committing the AT&T store robbery and attempted robbery of Owsley.

As part of his investigation, Donnel measured distances in the AT&T store. The distance from the front desk on the sales floor to the safe in the storage room was 35 feet. The distance from the rear desk with the cash drawer to the center of the storage room was 20 feet, and the distance from the rear desk to the safe in the storage room was 27 feet.

### d. March 30, 2013 Radio Shack Robbery

On March 30, 2013 Contreras was working as the assistant manager at a Radio Shack store on Palmdale Boulevard in the city of Palmdale. She arrived at the store around 8:40 a.m. to open the store. As she entered the store, she saw Burnes sitting at the side of the building wearing a black "hoodie" sweatshirt with gray stripes and carrying a backpack. Contreras went inside and locked the front door behind her. As part of her

8

opening, Contreras unlocked the shutters over the front windows and lifted them up. Once she did that, she could see out the front window.

Contreras described the layout of the store. The sales floor had a door to a hallway that led to the stockroom where they kept their high-end merchandise. The hallway also had a door that exited to Palmdale Boulevard. Inside the stockroom were locked cages with merchandise. The cage on the left had laptops, expensive headphones and other items. The cage on the right had cell phones.

Contreras unlocked the front door to open the store around 9:00 a.m. A few minutes later, Contreras saw the man from outside approach the front door. She assumed that Burnes was the first customer of the day. She was getting ready to greet him when he opened the door fast and pulled out a black gun that he pointed at Contreras. It looked like a real gun. Contreras was "very frightened."

Burnes told Contreras to "hurry up" and lock the front door. Contreras said the keys were in the back, and Burnes followed her to the back stockroom to get them. Burnes then walked with Contreras to the front of the store and Contreras locked the door. Burnes also had Contreras pull down all the shutters, including the one in front of the door. Once the shutters were down, no one could see inside the store.

Burnes said he wanted iPhones and iPads, and Contreras said they were in the back. Burnes said to hurry up, and he walked her to the back stockroom. Burnes made Contreras unlock the cage with the iPhones. He then ordered her to get on her knees and face the corner so she could not see him. Contreras could not see anything but could hear things being moved around in the cage. Contreras stayed on her knees for two to three minutes, then Burnes said he wanted money and asked if she had a safe. Contreras responded that it would take 10 minutes to open the safe. Burnes said, "Fuck that." He added, "Just give me the cash in the register."

Contreras walked back to the sales floor with Burnes, unlocked the register, and removed about $330 in cash. She put the money in a bag Burnes gave her. Burnes next said he wanted "Beats By Dre," which is a high-end headphone. Contreras said they were in the back. Contreras testified that Burnes "made me walk back over there to the

9

back room," and he followed her.[6] Contreras unlocked the second cage. The set of headphones was the last item Burnes took from the store. Contreras testified that Burnes "made" her get back down on the floor and look away from him, which she did.

Contreras sat on the floor for one to two minutes. She could hear things moving in the cages. Next, Burnes asked if the exit door in the hallway had an alarm. Contreras responded that the door did not have an alarm but made a sound when it opened. Burnes told her to open the door slowly, which she did. The door made a "little noise," and Burnes told her to close it. Burnes then had Contreras turn around and put her hands behind her back. Burnes tied one of her arms with a zip tie, which he put on "extremely tight." At that point, Contreras "felt really scared because I didn't know what he was going to do to me." She was concerned that Burnes might hurt her because she was the only witness.

Contreras told Burnes that the zip tie was hurting her, and he grabbed her arm and looked at it. Burnes said, "shit, go get some scissors." Burnes followed Contreras to the stockroom to get scissors. Contreras then cut the zip tie.

Burnes next ordered Contreras back to the hallway where he had her put her hands behind her back. Burnes tied both her hands with zip ties. Burnes then opened the door to the sales room, took her into the room, and "made [her] sit in the front of the room and he told [her] not to call anyone for 10 minutes." Burnes told Contreras, "don't make me hurt you because I will." Contreras heard Burnes go out the back door when she heard the beep and the door slam. Contreras waited about a minute, got up slowly and opened the back door to see if Burnes was there. When she did not see him, she freed one of her hands, shut the back door, ran into the stockroom, and hit all the panic alarms. Contreras then ran to the front of the store to call 911.

---

[6]     Contreras did not state whether Burnes continued to point a gun at her as he "made" her move around the store. However, she testified that Burnes pointed a gun at her when he first entered the store, and then continued to order her around the store to collect merchandise.

Contreras told the 911 operator that the robber was wearing a black and gray sweater with stripes, with a hoodie. She said he wore black glasses, black gloves, black pants, black leather shoes with gray laces. He weighed around 180 pounds and was about 5 feet and 8 or 9 inches. He said someone was waiting for him outside.

There were four cameras in the store that captured the robbery. Portions of the videotape were played for the jury.

e. Investigation of the March 30, 2013 Robbery

Los Angeles County Sheriff's Department Detective Michael Thompson investigated the Radio Shack robbery. About a week after the robbery, Thompson showed Contreras a six-pack of photographs. Contreras said that she was 75 to 80 percent sure the robber was the person in position number 5, which was a photograph of Burnes's brother. The detective returned with another six-pack, and Contreras said she did not recognize anyone in the six-pack. The second six-pack contained a photograph of Ray.

A week later, Thompson returned with another six-pack. This time Contreras said she was 85 percent sure based on his jaw line and features on his face that the robber was number 2, which was Burnes. At the preliminary hearing, Contreras said she was 100 percent sure it was Burnes.

Thompson later obtained a search warrant and searched Burnes's home. Police recovered from Burnes's bedroom a pair of sweatpants similar to those worn by the suspect in the video, along with a hooded gray sweatshirt with stripes and a backpack that contained zip ties.

When Burnes was interviewed by the police, he said that he was hired as a lookout. He said he was not inside the store, but was across the street at the bus stop.

2. *Defense Motion to Dismiss*

At the close of the prosecution's case, the defense moved to dismiss the kidnapping charges under section 1118.1 on the ground that the prosecution had not made

11

a prima facie showing of asportation to prove kidnapping for robbery. The court denied the motion, finding that in both the AT&T and Radio Shack robberies the victims were moved multiple times and that there was sufficient evidence for the case to go to the jury.

### 3. *The Defense Case*

The defendant did not testify and the defense did not present any witnesses.

## C. *Verdicts and Sentencing*

The jury found Burnes guilty on four counts related to the April 11, 2013 AT&T robbery, including count 1 for kidnapping to commit robbery of Solaiza (§ 209, subd. (b)(1)), count 2 for the second degree robbery of Reid (§ 211), count 3 for the second degree robbery of Solaiza (§ 211), and count 4 for false imprisonment by violence of Reid (§ 236). The jury also convicted Burnes on count 6 for the attempted second degree robbery of Owsley on the same date (§§ 211, 664).

The jury convicted Burnes of two counts related to the March 30, 2013 Radio Shack robbery, including count 7 for kidnapping to commit robbery of Contreras (§ 209, subd. (b)(1)) and count 8 for the second degree robbery of Contreras (§ 211).

The jury did not return verdicts for false imprisonment by violence of Solaiza (§ 236; count 5) and false imprisonment by violence of Contreras (§ 236; count 9) because they were lesser included offenses of counts 1 and 7 for kidnapping, respectively.

Burnes waived his right to a jury trial as to the alleged prior conviction. The court found true the allegation that Burnes had a prior conviction for a violent or serious felony under the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), one prior serious felony conviction within the meaning of section 667, subdivision (a)(1), and one prior prison term within the meaning of section 667.5, subdivision (b). The court denied Burnes's *Romero*[7] motion to strike the prior conviction.

---

[7]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

On counts 1 and 7, for the kidnapping for robbery of Solaiza and Contreras, the court imposed on each count an indeterminate sentence of seven years to life, doubled under the three strikes law, for two terms of 14 years to life to run consecutively. The court also imposed a five-year enhancement under section 667, subdivision (a)(1), on each count for Burnes's prior conviction of a serious felony. The court imposed a total indeterminate sentence of 28 years to life plus 10 years.

On counts 3 and 8 for the second degree robbery of Solaiza and Contreras, respectively, the court imposed the upper term of five years doubled on each count, but stayed the sentence pursuant to section 654 as punishment for the same conduct alleged in counts 1 and 7.

On the determinate counts, the court designated count 2 for second degree robbery of Reid as the principal term. On count 2, the court imposed the upper term of five years, doubled under the three strikes law, to 10 years. The court sentenced Burnes on count 6 for the attempted robbery of Owsley to run consecutive for one-third the midterm of eight months, doubled for an additional 16 months. The court also imposed a five-year enhancement under section 667, subdivision (a)(1), for Burnes's prior conviction of a serious felony. The total aggregate determinate sentence was 16 years and four months.

The court sentenced Burnes to an aggregate determinate term of 26 years four months, plus an indeterminate sentence of 28 years to life to be served in state prison.

**DISCUSSION**

A. *Standard of Review*

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] . . . In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] '. . . We resolve neither credibility issues nor evidentiary conflicts . . . .

13

[Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

## B. *Requirement of Asportation for Aggravated Kidnapping*

As our Supreme Court has held, "[t]he essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement. [Citation.]" (*Dominguez*, *supra*, 39 Cal.4th at p. 1152.) Section 209, subdivision (b)(2), provides as to kidnapping to commit robbery, rape and other enumerated crimes: "This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."

Our Supreme Court in *People v. Rayford* (1994) 9 Cal.4th 1, 12 (*Rayford*) described the test for asportation necessary for aggravated kidnapping to involve two prongs, as first set forth in *People v. Daniels* (1969) 71 Cal.2d 1119, 1131, fn. 5 (*Daniels*).[8] The court in *Rayford* held: "As for the first prong, or whether the movement is merely incidental to the crime of robbery, the jury considers the 'scope and nature' of the movement. [Citation.]" (*Rayford*, *supra*, at p. 12.) The second prong is "whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in robbery."[9] (*Id*. at p. 13.) The court has made clear that these two prongs

---

[8]    The court held that the asportation standard for kidnapping for rape is the same as that applied to kidnapping for robbery. (*Rayford*, *supra*, 9 Cal.4th at pp. 20-21.)

[9]    In 1997, the Legislature amended section 209, subdivision (b)(2), to remove the word "substantial" from the phrase "increases the risk of substantial harm to the victim." (*People v. Vines* (2011) 51 Cal.4th 830, 869, fn. 20 ["[i]n 1997, the Legislature revised the statute . . . and modified the asportation standard by eliminating the requirement that the movement of the victim 'substantially' increase the risk of harm to the victim"]; *People v. Robertson* (2012) 208 Cal.App.4th 965, 978.) The Fifth District in *Robertson* noted that *Daniels*, *Rayford* and *Dominguez* (1997 rape) all applied the prior language of

14

"'are not mutually exclusive, but interrelated.' [Citation.]" (*Dominguez*, *supra*, 39 Cal.4th at p. 1152.) "[E]ach case must be considered in the context of the totality of its circumstances." (*Ibid*.)

With respect to the first prong, the court should consider the actual distance a victim is moved. However, the Supreme Court has made clear that "no minimum distance is required to satisfy the asportation requirement [citation], so long as the movement is substantial. [Citation.]" (*Dominguez*, *supra*, 39 Cal.4th at p. 1152.) Further, the actual measured distance "must be considered in context, including the nature of the crime and its environment." (*Ibid*.)

For purposes of the second prong, the Supreme Court has "articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes." (*Dominguez*, *supra*, 39 Cal.4th at p. 1152.)

Our Supreme Court has also made clear that increased harm includes psychological harm. (See *People v. Nguyen* (2000) 22 Cal.4th 872, 886.) As the court held in *Nguyen*, "substantial movement of a victim, by force or fear, which poses a substantial increase in the risk of psychological trauma to the victim beyond that to be expected from a stationary robbery, seems an entirely legitimate basis for finding a separate offense. To conclude the word 'harm,' as used in section 209, subdivision (b), includes psychological harm is thus reasonable." (*Ibid*., fn. omitted; see also *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1050 [movement of rape victim to dark area increased risk of "'psychological trauma . . . beyond that to be expected from a stationary' sexual attack"].)

---

section 208, subdivision (d), that required that the "movement substantially increase the risk of harm to the victim . . . ." (*Robertson*, *supra*, at p. 979.) Accordingly, the second prong of the asportation test established by our Supreme Court no longer requires that the movement "'substantially'" increase the risk of harm to the victim. (*Vines*, *supra*, at p. 869, fn. 20.)

15

In *Dominguez*, the court found substantial evidence supported the aggravated kidnapping charge. There, the defendant forced the victim from the side of the road to a location in an orchard 25 feet away and 10 to 12 feet below the level of the road, "where it was unlikely any passing driver would see her." (*Dominguez*, *supra*, 39 Cal.4th at p. 1153.) The court found that moving the victim from a relatively open area next to the road to a more secluded location "substantially decreas[ed] the possibility of detection, escape or rescue" and "substantially increased her risk of harm." (*Id.* at pp. 1153, 1154.) Similarly, in *Rayford*, the court found that movement of a victim 105 feet to an area behind a wall to rape her was not merely "incidental" to the attempted rape, and substantially increased her risk of harm. (*Rayford*, *supra*, 9 Cal.4th at pp. 6, 14, 22.)

In discussing the importance of the context of the movement involved, the court in *Dominguez* cited to *People v. Shadden* (2001) 93 Cal.App.4th 164, 167, in which the court found that moving a victim only nine feet from the front counter of a store to the small back room for the purpose of raping her was asportation, and *People v. Jones* (1999) 75 Cal.App.4th 616, 629, in which the court found asportation where the defendant moved the robbery victim 40 feet within a parking lot into a car to rob her. (*Dominguez*, *supra*, 39 Cal.4th at p. 1152.)

The court distinguished these movements from the "brief and trivial movements" of six to 30 feet around an apartment to rob and rape the victims in *Daniels*, *supra*, 71 Cal.2d at pp. 1123-1125, and the movement of two victims 35 to 45 feet from the teller area to a vault for a robbery in *People v. Washington* (2005) 127 Cal.App.4th 290, 299-300 (*Washington*). (*Dominguez*, *supra*, 39 Cal.4th at pp. 1153-1154.)[10]

Burnes relies heavily on *Washington* to argue that the movement of the victims here was incidental to the robberies. In *Washington*, this district found the movement of

_____

[10] The court in *Dominguez* also distinguished *People v. Stanworth* (1974) 11 Cal.3d 588, 597-598, in which the court found movement of a victim 25 feet into an open field where the defendant bound, raped and robbed her was "incidental" to the crimes on the basis that movement of the victim into an open field did not remove her from the public view or increase her risk of harm.

16

the victims from the teller area to the vault to take money was brief and "incidental to the robbery within the meaning of *Daniels*," and thus could not support an aggravated kidnapping charge. (*Washington*, *supra*, 127 Cal.App.4th at p. 299.) Central to the holding was the court's statement of "[t]he rule to be derived from these [Supreme Court] cases . . . that robbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises." (*Id*. at p. 300.) In this case, however, in both the AT&T and Radio Shack robberies, Burnes had taken the last valuables prior to moving the two victims to a different location.

Burnes also cites to the language in *Daniels* that "when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him — whether it be a residence . . . or a place of business or other enclosure — his conduct generally will not be deemed to constitute the offense proscribed by section 209. Movement across a room or from one room to another, in short, cannot reasonably be found to be asportation 'into another part of the same county.' [Citation.]" (*Daniels*, *supra*, 71 Cal.2d at p. 1140.)

The Supreme Court in *People v. Mutch* (1971) 4 Cal.3d 389, 398-399 and *People v. Williams* (1970) 2 Cal.3d 894, 900 relied on this language in holding that the movement of the victims did not support aggravated kidnapping charges. In *Mutch*, the court held that movement of the first victim 30 or 40 feet to rob a safe and movement of a second victim 30 or 35 feet to take his wallet were "brief movements . . . merely incidental to the robberies, and did not substantially increase the risk of harm beyond that inherent in the robberies themselves." (*Mutch*, *supra*, at p 397.)

In *Williams*, the defendant entered a gas station and asked the victim for money at gunpoint. After the victim handed over his money, the defendant locked him in a bathroom in the gas station. The defendant later let the victim out and asked him to help carry a tool box and tires outside to a station wagon. (*People v. Williams*, *supra*, 2 Cal.3d at pp. 899-900.) The court held that the movements of the victim before and after he was locked in the bathroom were brief and were made "solely to facilitate the commission of

17

the crime of robbery," and thus fell within the meaning of "incidental" to the robbery under *Daniels*. (*Id*. at p. 902.)

In this case, the movement of the victims was within the same store where the robbery occurred. However, unlike *Mutch*, where the defendant moved the victims before robbing them, and *William*s, in which the defendant moved the victim to take his money and then steal tires and a tool box, here Burnes took the last items of merchandise prior to ordering the victims to a different location where he tied them up.

Further, the Supreme Court since its holding in *Daniels* has clarified that while "*generally*" movement of a victim inside the premises where he or she is found will not constitute aggravated kidnapping, "there may be circumstances in which a robber can properly be convicted of kidnapping even though he does not take his victim outside the premises in question." (*People v. Timmons* (1971) 4 Cal.3d 411, 415.)[11]

The holding by this district in *People v. Corcoran* (2006) 143 Cal.App.4th 272 is directly on point. There, the defendants intended to rob a bingo hall where five people were working, but one employee escaped and called for help. The defendants aborted the robbery and moved the four remaining victims 10 feet into an office at the back of the bingo hall with no windows and a solid door. (*Id*. at pp. 276, 279.) The court held that "the movement of the victims did not serve to facilitate the forcible attempted taking of money from the bingo hall. Rather, it served other purposes squarely recognized by the Supreme Court in [*Dominguez*], as supporting a finding of a substantial increase in danger: removing the victims from public view, decreasing the odds that the attempted robbery of cash from the bingo hall would be detected . . . and facilitating the robbers'

---

11    The court in *Timmons* concluded, however, under the prior asportation test of "substantial risk" that where the defendant forced two victims to drive five blocks from a busy parking lot to a less crowded location to take a bag of money from them, this "reasonably brief" movement was "incidental" to the robbery because the bag of money was in the car, and the increase in risk was "slight," not "substantial." (*People v. Timmons*, *supra*, 4 Cal.3d at pp. 415-416.) The court noted, though, that movement of five city blocks could substantially increase the risk to a victim under a different fact pattern. (*Id*. at p. 416, fn. 2.)

18

escape." (*Id*. at p. 280.) While in *Corcoran* the robbers had abandoned their plans for robbery, the movement of the victims into the back room served the same purpose as here — to allow the robbers to escape without detection.

Burnes also relies on *People v. Hoard* (2002) 103 Cal.App.4th 599, 607, in which the court found the defendant's movement of two jewelry store employees 50 feet into the back office did not support aggravated kidnapping charges where the defendant moved the employees so he could have free access to the jewelry in the store and conceal the robbery from any customers who would enter the store. The court found this movement "served only to facilitate the crime with no other apparent purpose." (*Ibid*., fn. omitted.) Further, the court found that "the victims may have been at less risk tied up in the back office where they could not try to thwart the robbery than had they remained at gunpoint in the front of the store" and that movement of the employees to the back office did not pose "'a substantial increase in the risk of psychological trauma to the victim beyond that to be expected from a stationary robbery . . . .'" (*Ibid*., fn. omitted.)

This district has criticized the *Hoard* decision for its holding that "necessary movement is incidental movement" (*People v. Hoard*, *supra*, 103 Cal.App.4th at p. 605). (See *People v. James* (2007) 148 Cal.App.4th 446, 455 & fn. 8 [finding asportation where defendant forced victim into bingo club to gain entry, finding that "movement necessary to a robbery may or may not be merely incidental to it"]; *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1047, 1050-1051 [finding asportation where defendant moved rape victim 133 feet to unlit area where less likely to be detected, noting that *Hoard* is not in harmony with *Rayford* and other case law in its conclusion that necessary movement must be incidental].)

As we discuss below, this is precisely such a case — while moving victims to a hidden location to tie them up aids commission of the robbery, and thus arguably may be "necessary," this does not mean the movement is "incidental" to the robbery or that it did not increase the risk of harm from the crime.

We next turn to the facts in this case.

19

**C.** *Burnes's Movement of the Victims Increased Their Risk of Psychological Harm and Decreased the Likelihood of Detection*

       1. *The AT&T Robbery*

With respect to the AT&T robbery, Burnes moved Solaiza around the store in order for Burnes to take different phones, accessories, and then cash. The last item taken in the robbery was cash from the cash register. After Burnes took the cash, he forced Solaiza to move from the rear desk in the store approximately 20 feet to the back storage room where he tied her up with cables. The storage room windows were painted black, and therefore Solaiza was less likely to be discovered there than in the front of the store where the robbery ended.

By moving Solaiza to the storage room, Burnes "removed her from public view and substantially increased her risk of harm." (*Dominguez*, *supra*, 39 Cal.4th at p. 1154.) While the risk of physical harm in the storage room was not greater than in the open store, the jury could have reasonably found that by leaving Solaiza tied up in the storage room with no windows and less likelihood of being found, Burnes increased the psychological harm to her.

The principal difference between this case and *Dominguez* is that in *Dominguez*, the movement occurred *before* the rape, thus insuring that the defendant could commit the crime without being detected. In this case, Burnes had taken all the merchandise by the time he moved Solaiza into the storage room. Still, we find the holding in *Dominguez* instructive because the forced movement of Solaiza made it harder for the authorities to discover her in the storage room. But for Reid pressing the panic alarm in the storeroom and Solaiza breaking free to call 911, the police would not have come to the store when they did.

While Burnes argues that his actions in moving Solaiza to the storage room and tying her up were merely the final acts of the robbery, and thus "incidental" to the robbery, in fact Burnes could have left Solaiza in the front of the store as soon as he took the cash from the register. The only purpose in moving Solaiza into the storage room, as in *Dominguez* and *Corcoran*, was to prevent her from being discovered and to enable

Burnes and Ray to flee the store without detection.  We therefore find substantial evidence of asportation to support the aggravated kidnapping charge.

### 2. *Robbery of Radio Shack*

In the Radio Shack robbery, Burnes moved Contreras to different locations within the store at gunpoint to obtain phones, headphones, and cash.  The last item Burnes took was the set of headphones from the cage in the stockroom.  At this point, Burnes could have tied up Contreras and left her in the stockroom.  Instead, he moved her to the hallway to show him whether there was an alarm on the exit door from the hallway leading to the street.  Burnes then tied Contreras up with a zip tie, walked her back to the stockroom to obtain scissors, and cut the zip tie,[12] then directed her back to the hallway and tied her up again.  After tying Contreras up a second time with zip ties, Burnes forced Contreras to walk from the hallway to the sales floor where he had her sit on the floor.  In the sales room, the shades had been pulled down so no one could see in.  In addition, the door had been locked using a key, preventing anyone from entering and making it more difficult to leave without a key.

We find there was substantial evidence from which the jury could have reasonably found that the actions by Burnes to move Contreras from the stockroom to the hallway, back to the stockroom, then to the hallway, then to the sales room were not "incidental" to the robbery, as to which the last act was Burnes's taking of the headphones in the stockroom.  Further, by moving Contreras away from the hallway with a door that led to the street and into the sales room with the shutters pulled down and door locked, Burnes

---

[12]     While Burnes moved Contreras to the stockroom to get scissors to reduce her pain from the zip tie, we find the movement of Contreras from the stockroom to the hallway and then to the sales floor is sufficient asportation to support the aggravated kidnapping charge.

decreased the risk of discovery of Contreras and made it easier for Burnes to flee without detection.[13]

## DISPOSITION

The judgment is affirmed.

FEUER, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[13]     The jury also could have found that moving Contreras from the hallway near an exit door into the sales room with all the shutters pulled down increased the risk of psychological harm to her.

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.