Filed 5/16/16  P. v. Cabrera CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARCOS CABRERA,<br><br>Defendant and Appellant. | B259041<br><br>(Los Angeles County<br>Super. Ct. No. BA395649) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stacy S. Schwartz and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

## INTRODUCTION

Marcos Cabrera, Oscar Flores, and Joyner Fernandez were prosecuted for robbing a clothing warehouse and kidnapping an employee during the course of the robbery. The jury could not reach a verdict as to Flores and acquitted Fernandez. The jury convicted Cabrera of kidnapping to commit robbery (Pen. Code,[1] § 209, subd. (b)(1)) and second degree robbery (§ 211). The jury also found true allegations that Cabrera personally used a firearm (§§ 12022, subd. (a)(1), 12022.5, 12022.53, subd. (b)) and stole property worth more than $200,000 (§ 12022.6, subd. (a)(2)). The trial court sentenced him to state prison for an indeterminate term of life with the possibility of parole and a determinate term of 12 years. On appeal, Cabrera claims: (1) the evidence was insufficient to support his conviction for kidnapping to commit robbery; (2) the prosecutor used an unduly suggestive identification procedure during trial; and (3) the prosecutor committed misconduct by coaching a witness to identify him. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    THE ROBBERY AND KIDNAPPING

Chiqle Denim, a manufacturer and wholesaler of jeans, has a warehouse and design office in Los Angeles. On March 27, 2012, designer Hyunjin Kim returned to work at the warehouse at 2:30 p.m. No one else was inside when she entered. Before she could lock the door behind her, four men rushed inside. A "fat" Hispanic man wearing "hip hop" style clothing and an orange jacket approached Kim, grabbed her, and put a gun to her head. A taller Hispanic man with "Jordan shoes" then held a gun to the other side of her head. Kim later identified Cabrera as the short, heavyset gunman and Flores as the taller gunman. Kim could not identify the two other men who were with Cabrera and Flores,[2] because she did not see their faces.

---

[1]    All further statutory references are to the Penal Code.

[2]    Recognizing that Flores was not convicted in this case, we refer to him as the second gunman only for ease of reference without intending to imply guilt on his part.

Frightened, Kim grabbed both guns that were pointed at her head. Cabrera had a revolver that looked like it came "[f]rom an old Western movie"; Flores had a silver gun that "looked more current." The gunmen told her to close her eyes and remove her hands from their guns, but she was so afraid she continued to hold onto them. They then struck her in the head and arms with their fists and guns until she fell to the ground. Kim begged them not to kill her. The gunmen repeatedly instructed her to close her eyes, but she kept opening them out of fear.

The gunmen dragged Kim behind a nearby clothing rack, pushed her down onto her stomach, and used tape to bind her legs and tie her hands behind her back. While she was being tied up, Flores said, "Where's the money?" She told him "this is a warehouse and there's no money here." When he asked again, she repeated that there was no money at the warehouse. Cabrera then used the tape to cover her mouth and threw a pair of jeans over her eyes. Kim was crying and "thought [she] was going to die so [she] just want[ed] to take a good look at these people." She was able to see them through the legs of the jeans draped over her head.

Subsequently, Cabrera placed Kim over his shoulder and carried her approximately 22 feet to the owner's office located in the back of the warehouse, where he put her on the floor. While in the office, Kim was not visible from the front of the warehouse. Cabrera left, but Flores stayed with Kim and kept his gun pointed at her head. Almost immediately after being taken to the office, Kim heard a truck pull up to the warehouse, the large shutter doors open, and a forklift move boxes inside the warehouse. Fifteen or 20 minutes later, the shutters went down, and Flores left the office. She next heard a few of the men talking in the front, followed by the sound of a door opening and closing. Then it was quiet. Kim quickly loosened the tape binding her arms and called 911 from the owner's office.

## B.   THE ARREST OF THE SUSPECTS

Outside the warehouse, a police officer named Jorge Villaescusa made a traffic stop of a Ford Explorer in the nearby area. The driver, Christian Tabares, was alone in the vehicle (which was registered to Flores). While the officer was making the stop,

3

Cabrera, Flores, and Fernandez exited Chiqle Denim. By this time, two other officers had arrived to assist in the stop of the Ford Explorer. Officer Villaescusa directed one of the officers to remain with Tabares while the other officer accompanied him to drive toward the three men leaving the warehouse.

When the two officers approached the three men, they fled. As they were fleeing, Kim emerged from the warehouse screaming that "five Mexicans . . . with guns had just robbed her" and that one of them was wearing orange. The officer who had stayed with Tabares communicated this information to Officer Villaescusa, who continued to pursue the fleeing suspects and ordered them to stop. Flores and Fernandez complied, but Cabrera continued to run until he was tackled by Officer Villaescusa. Officer Villaescusa searched Cabrera and discovered an unloaded .357 revolver in his "crotch area." In addition, Cabrera had U.S. and Korean currency, two cameras, and a cell phone.

Ten or 15 minutes after the three men were arrested, Kim identified Cabrera and Flores as the two men who had held guns to her head during the robbery. Cabrera was wearing an orange sweatshirt or jacket. After the identification, the officers took Kim inside the warehouse, where she noticed items missing from her purse, including Korean currency and her cell phone. Also missing were boxes of merchandise that had filled the room—worth more than $250,000— and two cameras and an iPad. Kim later identified one of the cameras found on Cabrera as having been taken from the warehouse.

During their investigation, the police discovered Cabrera's fingerprint on the forklift inside the warehouse. They also found a roll of tape in the Explorer that was similar to the tape used to bind Kim's hands, legs, and mouth.

## C.     CABRERA'S TRIAL TESTIMONY

At trial, Cabrera admitted that he was in the Chiqle Denim warehouse, and that he operated a forklift to help load boxes onto a truck. He testified, however, that he did so as a day laborer hired by a man named "Cavé," who had agreed to pay him $150 to load the truck and clean the warehouse.

According to Cabrera, Flores had driven him to the warehouse along with Fernandez, Tabares, and another man. They drove in the Ford Explorer that was later

stopped by the police. When they arrived, Cabrera saw a white truck backed up into the warehouse through a large shutter door; and when he went inside, he saw four other men but no woman. One of the four men inside the warehouse was "fat" with curly hair and was wearing a large orange sweatshirt. A man whom Cabrera knew as "Poncho" told him and the others what to do. Cabrera drove the forklift and moved boxes near the truck for loading. He did not know what was inside the boxes. When all the boxes were placed in the truck, he was told to go to the parking lot where the boss was parked so he could be paid.

Cabrera left the warehouse with Flores and Fernandez soon after the white truck was loaded with the boxes. As Cabrera was walking, Poncho retrieved a gun from the truck and handed it to him. Poncho told Cabrera to give the gun to Cavé. When Cabrera told Poncho he did not want the gun because he had never held one before, Poncho told him not to worry because the gun was unloaded. Poncho then got into the truck and drove off with three other men.

After explaining why he was carrying a gun, Cabrera addressed other incriminating evidence found on him when he was arrested. Addressing the Korean currency that appeared to have been taken from Kim's purse, Cabrera explained that he received that money when he worked part-time for Adriana Lee and her husband at a clothing store. He collected Korean currency, and Ms. Lee had given it to him for good luck. Addressing the two cameras that appeared to have been taken from the warehouse, Cabrera admitted he had one of them on him but not the other. He had purchased the camera earlier that day from another day laborer (whose name he did not know) and was going to pay him $40 after he returned from the warehouse job.

In rebuttal, the prosecution called a detective who went to the address that Cabrera had given for the clothing store where he worked. The detective testified that no such business existed at or around the address given. Cabrera then called two witnesses in surrebuttal who testified that Cabrera had worked for the Lees at the clothing store, although the business had been closed for at least five years.

5

**DISCUSSION**

**A.      THE CHALLENGE TO THE SUFFICIENCY OF THE ASPORTATION EVIDENCE**

Cabrera contends that the evidence is insufficient to support his conviction for kidnapping to commit robbery.  In reviewing a challenge to the sufficiency of the evidence, we examine the record in the light most favorable to the judgment and inquire only whether the evidence is """"reasonable, credible and of solid value"""" such that a trier of fact reasonably could find the defendant guilty beyond a reasonable doubt.  (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)  Applying this standard, we reject Cabrera's contention, finding the evidence sufficient to support the asportation element of the offense.[3]

1.      *The Two Prongs of Aggravated Kidnapping*

Section 209, subdivision (b), provides that "[a]ny person who kidnaps or carries away any individual to commit robbery" faces life in prison "if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the [robbery]."  The two prongs of this asportation requirement are related: whether the victim's forced movement was merely incidental to the robbery is "necessarily connected" to whether it increased the risk of harm.  (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 (*Dominguez*).)  In the final analysis, "[t]he essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement." (*Ibid*.)  In measuring the risk, "each case must be considered in the context of the totality of its circumstances." (*Ibid*.)

_____

[3]      Cabrera does not challenge the jury instruction given in this case, which required the prosecution to prove that:  Cabrera intended to commit robbery; he "took, held, or detained [Kim] by using force or by instilling a reasonable fear"; and he moved Kim "a substantial distance" "beyond that merely incidental to the commission of the robbery." The jury was further instructed:  "As used here, *substantial distance* means more than a slight or trivial distance.  The movement must have increased the risk of physical or psychological harm to the person beyond that necessarily present in the robbery.  In deciding whether the movement was sufficient, consider all the circumstances relating to the movement." (CALCRIM No. 1203.)

6

Under the "merely incidental" prong, courts look to "'the "scope and nature" of the movement.'" (*Dominguez*, *supra*, 39 Cal.4th at p. 1151, italics omitted.) The distance of the movement is a factor, but only insofar as it bears on an evaluation of the increased risk to the victim, taking into account "'the context of the environment in which the movement occurred.'" (*Ibid*., italics omitted.) "In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient. For example, moving robbery victims between six and 30 feet within their home or apartment [citation] or 15 feet from the teller area of a bank to its vault [citation] may be viewed as merely incidental to the commission of the robbery and thus insufficient to satisfy the asportation requirement of aggravated kidnapping. Yet, dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her [citation] or forcibly moving a robbery victim 40 feet within a parking lot into a car [citation] might, under the circumstances, substantially increase the risk of harm to the victim and thus satisfy the asportation requirement." (*Id*. at p. 1152.) Moreover, "the [mere] fact that the movement of a robbery victim *facilitates* a robbery does not imply that the movement was merely incidental to it." (*People v. James* (2007) 148 Cal.App.4th 446, 454.)

Under the increased risk prong, courts apply the factors identified in *People v. Rayford* (1994) 9 Cal.4th 1, 12. The *Rayford* factors include consideration of the "decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes." (*Id*. at p. 13; accord, *People v. Jones* (1999) 75 Cal.App.4th 616, 629.) "The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." (*Rayford*, *supra*, at p. 14; accord, *People v. Vines* (2011) 51 Cal.4th 830, 871.)[4]

---

[4] In 1997, the Legislature amended section 209, subdivision (b)(2), to remove the word "substantially" from the phrase "'substantially' increase the risk of harm to the victim." (*People v. Vines*, *supra*, 51 Cal.4th at p. 869, fn. 20.) Cabrera nonetheless argues that the "substantially increase" standard applies, citing *Dominguez* to show that

2. *The Kidnapping Conviction in this Case*

After entering the front door of the warehouse, Cabrera held a gun to Kim's head and then beat, gagged, and bound her. He covered her mouth and head with tape and hid her behind a clothing rack with jeans thrown over her face. By this point, Cabrera and his fellow robbers had full access to the area of the warehouse necessary to complete the intended robbery—i.e., the front area where the merchandise was located. Nevertheless, Cabrera tossed Kim over his shoulder and carried her 22 feet to the back office, where she could not be seen from the front and where she was held with a gun at her head and threats on her life for the next 15 or 20 minutes. These facts are sufficient to support the jury's finding that the prosecution had proven the two prongs of the asportation element of aggravated kidnapping.

The movement of Kim to the back office was not "merely incidental to the commission" of the robbery. Where, as here, the movement exceeds what is necessary for the robbery, the first prong of the asportation requirement is satisfied. (*People v. James*, *supra*, 148 Cal.App.4th at p. 455 ["Lack of necessity is a sufficient basis to conclude a movement is not merely incidental"].) The purpose of the robbery was to steal the merchandise located in the front of the warehouse where Kim was initially detained. Cabrera did not move Kim to the back office either to steal property from that location or to obtain an item from that location (e.g., keys to a vault) so that he could steal property elsewhere in the warehouse. (Compare *People v. Washington* (2005) 127 Cal.App.4th 290, 300 ["robbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises"].) Indeed, the robbers made no effort to search for or take

_____

this standard survives the amendment. But that 2006 decision expressly declined to reach the issue because the "defendant's offense predated the amendment." (*Dominguez*, *supra*, 39 Cal.4th at p. 1150, fn. 5.) Other courts have reached the issue and concluded, as we do here, that the standard applicable to crimes that post-date the amendment is the modified standard. (See, e.g., *People v. Robertson* (2012) 208 Cal.App.4th 965, 981 [legislative amendment changed the asportation standard from "substantially increased" to "increased" the risk of harm].)

8

anything from the office.[5]   Therefore, substantial evidence supports the jury's conclusion that Cabrera's forcible movement of Kim after she was immobilized, silenced, and hidden from view was unnecessary to the taking of the boxed merchandise.  (*James*, *supra*, at p. 455 & fn. 6; see also *People v. Corcoran* (2006) 143 Cal.App.4th 272, 279-280 [movement of the victims had nothing to do with facilitating the taking of cash, and seclusion of victims in the back office under threat of death was "clearly 'excess and gratuitous'"].)[6]

Citing *People v. Daniels* (1969) 71 Cal.2d 1119 and *In re Crumpton* (1973) 9 Cal.3d 463 (and cases cited therein), Cabrera argues that "a multitude" of California Supreme Court cases have determined that movement within a building incidental to a robbery is insufficient to support a conviction for kidnapping to commit robbery.  To the extent Cabrera is suggesting that an aggravated kidnapping can never occur by forcible movements inside the location of a robbery, he is mistaken.  (*People v. Timmons* (1971) 4 Cal.3d 411, 415 [rejecting "a rigid 'indoor-outdoor' rule" by which moving a victim inside the premises in which he is found is *never* sufficient asportation].)  Indeed, the Supreme Court has rejected that interpretation of *Daniels* and the other cases Cabrera cites.  (See *People v. Vines*, *supra*, 51 Cal.4th 830.)  In *Vines*, the defendant forcibly moved a restaurant manager to the restaurant's safe, and ordered him at gunpoint to open it.  The defendant then walked the manager from the safe to the back of the restaurant where he found three other employees and directed all four downstairs to the basement

---

[5]   While Kim was in the back office, Flores did continue to ask her if there was money in the warehouse.  There was no evidence, however, that Kim was moved to the office for purposes of obtaining money there.

[6]   According to Cabrera, the robbers had no choice but to bind, gag, and move Kim to commit the robbery.  While Cabrera was free to make this argument to the jury, the applicable standard of review precludes us from second-guessing the jury's contrary conclusion.  The facts of this case permitted the jury to find that the forcible movement to the back office—after Kim already had been secured—was an unnecessary part of the robbery.

9

freezer where he locked them inside. (*Id.* at p. 871.) Although the defendant's forcible movement of the victims was limited to movement inside the premises, the court concluded: "Under these circumstances, we cannot say the 'scope and nature' of this movement was 'merely incidental' to the commission of the robbery." (*Ibid.*; accord, *People v. Corcoran*, *supra*, 143 Cal.App.4th at pp. 278-279.)

Cabrera also argues that the short distance of the movement from the front to the back of the warehouse (i.e., 22 feet) was not substantial enough to allow the jury to find asportation. As discussed, the concept of asportation is not measured in distance alone. (*People v. Vines*, *supra*, 51 Cal.4th at p. 870.) A distance as little as nine feet may be sufficient. (See, e.g., *People v. Shadden* (2001) 93 Cal.App.4th 164, 167 [punching, grabbing, and dragging a video store owner nine feet to the back room deemed sufficient].) More significant than the distance traveled is the nature of the movement. Moving Kim from a large, open space in the front of the warehouse to a small, relatively closed space in the back of the warehouse reasonably could be construed as a potentially dangerous change in environment. (See *id.* at p. 169 [jury reasonably could find that going from open area to a closed room nine feet away materially changed the rape victim's environment].)

Turning to the next prong, we conclude that the evidence was sufficient to find that the movement increased the risk of harm to Kim. Cabrera moved Kim from the front of the warehouse, which was visible from the front door, to a more secluded area in the back. Kim was extremely vulnerable there, as she was bound, gagged, and held at gunpoint. In this situation, there was a risk of further victimization and other harm. (See *Dominguez*, *supra*, 39 Cal.4th at p. 1152 [risk factors include whether movement "enhances the attacker's opportunity to commit additional crimes"]; *People v. Lara* (1974) 12 Cal.3d 903, 908, fn. 4 [risk factors "include not only desperate attempts by the victim to extricate himself but also unforeseen intervention by third parties"].) The risk was heightened by the fact that the robbers already had "demonstrated [a] willingness to be violent" by brutally beating Kim with a gun minutes earlier. (*People v. Jones*, *supra*, 75 Cal.App.4th at p. 630 ["An increased risk of harm was manifested by [the] appellant's

10

demonstrated willingness to be violent, having knocked [the victim] to the ground, gripped her mouth so tightly as to leave a burn mark on her face, and grabbed for her as she fled the car"].)  These circumstances also increased the risk of psychological harm to Kim.  (See *People v. Nguyen* (2000) 22 Cal.4th 872, 886 [finding that the "increase in the risk of psychological trauma to the victim beyond that to be expected from a stationary robbery" can satisfy the asportation requirement].)  Thus, we reject Cabrera's argument that the only reasonable interpretation of the facts is that he reduced—rather than increased—the risk of harm by moving Kim to the back office.

## B. THE CLAIM OF AN UNDULY SUGGESTIVE IDENTIFICATION PROCEDURE

Cabrera next argues that the prosecution violated his due process rights by using an unduly suggestive identification procedure during trial—namely, by showing Kim photographs of defendants (taken on the day of their arrest) after she had made an in-court identification that differed from the one she made on the day of the arrest.

### 1. *The Relevant Facts*

Ten to 15 minutes after arresting Cabrera, Flores, and Fernandez for robbery, police officers drove Kim to a nearby location where the three men were being detained. As Kim remained seated in the patrol car, an officer brought each suspect within five to 10 feet of her.  When Kim saw Cabrera, she immediately started to scream and cry.  She identified him as one of the men who had held a gun to her head and described him that day as the short, heavyset man wearing orange.[7]  Kim then identified Flores as the other gunman, whom she described that day as the taller man wearing Jordan tennis shoes.[8]

---

[7]  Citing one officer's reference to Cabrera's jacket as red, Cabrera argues he "was wearing a red jacket, not orange hip-hop clothing so he was not the suspect who moved Kim."  This argument overlooks the substantial evidence supporting Kim's observation, including the testimony of other officers who described Cabrera as wearing an "orange" or "reddish orange" jacket or sweatshirt.  Moreover, the jurors saw photographs of Cabrera when he was arrested, which allowed them to independently assess the accuracy of Kim's clothing description and identification.

[8]  Kim was not able to identify Fernandez when he was next brought forward.

11

Kim made the same identifications of Cabrera and Flores at the preliminary hearing one year later.

More than two years after the robbery, Kim testified at trial. By that time, Cabrera's appearance had changed. Cabrera—who stood 5 feet, 5 inches tall—had lost about 100 pounds and looked "extremely skinny." In addition, he had changed his hair style and shaved his goatee. During Kim's first day of testimony, she was unable to identify Cabrera. Instead of identifying Cabrera as the "fat" man wearing orange clothing, she identified Flores as that person; and instead of identifying Flores as the tall person wearing Jordan tennis shoes, she identified Fernandez as that person. Kim testified, however, that she previously had identified the two gunmen within 10 to 15 minutes of the robbery when their faces were "fresh in [her] mind."

The next morning, before trial resumed, the prosecutor and a detective met with Kim and an interpreter. The prosecutor showed Kim the four photographs the police had taken of Cabrera, Flores, Fernandez, and Tabares on the day of the robbery. The prosecutor did not explain why she was showing Kim the photographs, nor did she tell Kim that she had "misidentified" anyone the previous day at trial. Rather, the prosecutor asked only if Kim recognized anyone in the photographs. Kim immediately picked up the photographs of Cabrera and Flores and identified them as the two men who had pointed the guns at her during the robbery.

When Kim's direct examination continued later that day, she identified Cabrera from the photographs as the man wearing orange who had tied her up and carried her into the back office and Flores as the taller man wearing Jordan tennis shoes. Kim testified she had been confused when testifying the prior day, but after looking at Cabrera's photograph taken on the day of his arrest, "[she] knew it was him."

2.    *Legal Analysis*

Cabrera argues that reversal is required because the prosecutor used an unduly suggestive and unreliable identification procedure that violated his right to due process of law as set forth in *Manson v. Brathwaite* (1977) 432 U.S. 98, 104-107 [97 S.Ct. 2243, 53

L.Ed.2d 140]. (Accord, *People v. Cunningham* (2001) 25 Cal.4th 926, 990.) We disagree.

Even if we assume that Cabrera did not forfeit the argument by failing to object, his claim fails on the merits. A due process challenge to the admission of identification evidence requires a defendant to show not only that the identification procedure was "unduly suggestive and unnecessary," but also that identification itself was unreliable under the totality of the circumstances. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 989.) Those circumstances include "the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*Ibid.*)

In challenging the identification procedure as being unduly suggestive, Cabrera argues that "[t]he photos were shown in an unregulated manner outside the courtroom where defense counsel was unable to observe or object." However, Cabrera cites no authority for the proposition that he was entitled to have counsel present during the prosecutor's preparation of a trial witness. Even if the prosecutor's trial preparation could be construed as a photographic lineup, Cabrera had no Sixth Amendment right to counsel at that meeting. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1250 [photographic lineup is not a critical stage of the prosecution].)

Nor has Cabrera cited any authority suggesting that the prosecutor was precluded from showing Kim the photographs before asking her about them at trial. Kim had identified Cabrera twice after the robbery, and Cabrera's appearance had changed substantially since that time. When Kim was unable to identify Cabrera in court, the prosecutor was clearly allowed to show her a photograph of Cabrera taken on the day of the robbery to determine whether she could identify the person as he looked that day. (*People v. Alexander* (2010) 49 Cal.4th 846, 903.) In these circumstances, there was no legal barrier to asking Kim about the photograph before trial. (*Ibid.*) As the court reasoned upon addressing a similar claim in *Alexander*: "We are unaware of any

13

authority that suggests that, had the prosecution waited until [the witness] was on the witness stand to show him the photographs, and had [the witness] made the same identifications, such a procedure would be subject to a constitutional challenge.  Rather, in such circumstances, [the] defendant would have explored the reliability of the identifications on cross-examination.  Here, the prosecutors showed [the witness] the exhibits the night before trial to learn what he would say about them before asking him in front of the jury.  This was not an unduly suggestive and unnecessary procedure under the facts of this case, and we therefore need not evaluate the reliability of the identification."  (*Ibid*.)  We reach the same conclusion here.

## C.    THE PROSECUTORIAL MISCONDUCT CLAIM

Relying on the same facts used to claim an unduly suggestive identification procedure, Cabrera argues the prosecutor committed misconduct by improperly coaching Kim to identify him as one of the gunmen.  For the reasons discussed above, even if we assume the issue has been preserved for appeal, the prosecutor's conduct did not amount to misconduct.  (See *People v. Alexander*, *supra*, 49 Cal.4th at pp. 901-903.)

## DISPOSITION

The judgment is affirmed.


BLUMENFELD, J.[*]


We concur:



ZELON, Acting P. J.                    SEGAL, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14